**UNITED STATES of America, Plaintiff-Appellee,**

**v.**

**Ronnie VIGIL, Defendant-Appellant.**

**No. 83–2035.**

United States Court of Appeals, Tenth Circuit.

Sept. 10, 1984.

Certiorari Denied Dec. 10, 1984. See 105 S.Ct. 600.

David N. Williams, Asst. U.S. Atty., Albuquerque, N.M. (William L. Lutz, U.S. Atty. and James F. Blackmer, Asst. U.S. Atty., Albuquerque, N.M., with him on the brief), for plaintiff-appellee.

Edwin Macy, Asst. Federal Public Defender, Albuquerque, N.M., for defendant-appellant.

Before BARRETT, DOYLE and McKAY, Circuit Judges.

BARRETT, Circuit Judge.

Ronnie Alfredo Vigil (Vigil) appeals from his jury conviction of a one-count indictment charging him with unlawful possession of a firearm after four felony convictions in violation of 18 U.S.C. Appendix § 1202(a)(1) and his enhanced sentence as a dangerous special offender pursuant to 18 U.S.C. § 3575.

Our review of the complicated factual scenario proceeds on the basis that

we must view the evidence, both direct and circumstantial, and all reasonable inferences to be drawn therefrom, in the light most favorable to the government. *United States v. Massey*, 687 F.2d 1348, 1354 (10th Cir.1982); *United States v. Blitstein*, 626 F.2d 774, 776 (10th Cir.1980), *cert. denied*, 449 U.S. 1102, 101 S.Ct. 898, 66 L.Ed.2d 828 (1981). "Evidence is not necessarily insufficient merely because the witness' testimony has been contradictory and the explanations therefor difficult of belief." *United States v. Jackson*, 579 F.2d 553, 558 (10th Cir.1978), *cert. denied*, 439 U.S. 981, 99 S.Ct. 569, 58 L.Ed.2d 652 (1978) (quoting *Batsell v. United States*, 403 F.2d 395, 401 (8th Cir.1968), *cert. denied*, 393 U.S. 1094, 89 S.Ct. 865, 21 L.Ed.2d 785 (1969)). The court of appeals is bound by the rule that resolution of conflicting evidence is exclusively within the discretion of the jury, as the trier of fact, and its verdict must be given added weight when the opportunity to hear and observe the witnesses is considered. *United States v. Hubbard*, 603 F.2d 137, 142–43 (10th Cir.1979).

### Litigative Proceedings

On February 16, 1983, Vigil was indicted on the charge of possession of a firearm after four previous felony convictions, in violation of 18 U.S.C.Appn. § 1202(a)(1). Following a jury trial on the firearm charge, Vigil was convicted on May 17, 1983. Promptly thereafter, the government moved, before entry of sentence, for a hearing on its allegation that Vigil is a dangerous special offender subject to an enhanced sentence under 18 U.S.C. § 3575, pursuant to the government's "Notice of Intent to Prosecute as a Dangerous Special Offender." On July 26, 1983, a hearing was held on the dangerous special offender charge. On August 12, 1983, the court found that Vigil was a dangerous special offender and imposed an enhanced sentence of five years. (The maximum sentence for violation of the firearm possession charge under § 1202(a) of two years was enhanced by three years pursuant to § 3575.) The trial court entered detailed findings and conclusions.

### Facts

Prior to Vigil's conviction on the possession of firearm charge in the instant case, he had a substantial record of adverse encounters with law enforcement officials commencing at age 18. He was convicted of felony burglary in the District Court of Santa Fe County, New Mexico, in May, 1971. After serving a short sentence, he was paroled August 25, 1972. Vigil's parole was subsequently revoked after he committed other crimes. On September 5, 1974, Vigil was released from confinement on the burglary sentence, but on February 11, 1976, he was sentenced to a term of one to five years in the penitentiary by the District Court of the County of Santa Fe, New Mexico, on charges of aggravated assault with a deadly weapon. Less than four months after he was released on probation in July, 1976, Vigil was indicted in New Mexico for harboring a fugitive, possession of heroin with intent to distribute, and escape from custody. Vigil then went to Arizona where he was later charged, tried, and convicted for possession of heroin with intent to distribute. His conviction was eventually reversed on appeal because of procedural errors at trial. *See United States v. Vigil*, 561 F.2d 1316 (9th Cir.1977). Vigil was returned to New Mexico to face the above-mentioned charges against him in that state in August, 1977. He pleaded guilty and on September 14, 1977, he was sentenced to two five-year concurrent terms by the District Court for the County of Bernalillo, New Mexico, for possession of heroin and harboring or aiding a felon.

Following reversal of his Arizona conviction, Vigil was returned to Arizona where he entered a plea of guilty to charges of unlawful possession of heroin and use of a communication facility to facilitate a controlled substance felony. He was sentenced by the United States District Court for the District of Arizona on December 22, 1977, to a four-year term on the possession charge and a one-year term on the use of the communication facility charge, the sen-

tences to run consecutively. Vigil was confined under the Arizona sentence until paroled on June 2, 1980. Thereafter, on July 4, 1980, Vigil shot and killed a man named Sandoval in Santa Fe, New Mexico, with a .38 calibre pistol. A New Mexico arrest warrant was issued for Vigil's arrest on a charge of first degree murder. In addition, a federal parole violation warrant was issued. After the Sandoval shooting, Vigil buried the .38 calibre pistol in his grandmother's back yard in Santa Fe. He then fled to Mexico where he worked as a barber in the City of Chihuahua for some eleven months.

Vigil returned to Santa Fe in early July, 1981. Vigil testified that prior to his return, he had been informed of extensive efforts by police officials to apprehend him. He said he had been told that Santa Fe police officers, in search of him, had conducted warrantless, threatening searches of homes of his relatives and friends and that certain police officers had threatened to kill him on sight. Vigil stated that he had considered turning himself in and, in this effort, had made contacts with a Santa Fe attorney and one of his sisters who worked in the office of the New Mexico Attorney General.

Further, Vigil testified that (1) he attempted to contact his federal parole officer to turn himself in, but could not make contact with him, (2) his three sisters, Elizabeth Saiz, Lydia Montoya and Arlene Bustos, all of Santa Fe, spoke with him by telephone prior to his return from Mexico and told him of threats on his life by officers Joe Garcia and David Leyba and of police threats, illegal raids, searches, and shootings by the police directed at Vigil's relatives and friends, (3) one Martha Vasquez, a Santa Fe, New Mexico, attorney whom he had contacted, informed him that she was unable to guarantee his safety if he surrendered, (4) his wife Marcella, who had been recently released from the penitentiary, informed Vigil of the threats made by officers Garcia and Leyba, and (5) he was sure that his life was in danger when he learned that a close friend of his died in the Santa Fe Municipal Jail—Vigil

believed his friend had been killed by police officers.

Based on the aforementioned reports, Vigil testified that he decided a safe surrender was impossible and that he must leave Santa Fe after he had found safe housing for his wife and her children. Thus, on July 21, 1981, Vigil dug up the .38 calibre pistol which he had buried in his grandmother's back yard and, instead of leaving Santa Fe, or turning himself in to the Sheriff, the FBI, the United States Marshal, or law enforcement authorities in any other county in New Mexico or any other state, he drove his wife on July 22 to an area in Santa Fe known as Banana Hill, purportedly to locate an apartment to rent for his wife and her children. At this time, he had the .38 calibre pistol in his possession, just as he had continually for some twenty hours. Vigil testified that while driving in the Banana Hill area, two city police officers in an unmarked yellow Camaro car suddenly tried to block his vehicle. Vigil immediately drew his pistol from his waistband and the police officers, in plain clothes, did likewise. Vigil emptied his pistol, striking each officer, and subsequently escaped. This incident occurred at about 4:00 p.m., July 22, 1981. Vigil and his wife fled on foot and hid in a garage where they remained overnight. The following morning they crept under a nearby fir tree where, at about 11:30 a.m., Vigil surrendered to Santa Fe County Sheriff's officers. Vigil testified that he was not afraid of the Santa Fe County officers. The .38 calibre fully-loaded pistol was close by Vigil on the ground near the fir tree when he surrendered.

Vigil was thereafter acquitted after a jury trial in state district court on the first degree murder charge in the shooting death of Sandoval. Vigil was then tried in New Mexico state district court on the charge of assault with intent to kill involving the shooting of the two police officers on July 22, 1981. His plea of self defense prevailed, and again Vigil was acquitted by the jury. Vigil was subsequently indicted, tried, and convicted of the instant charge,

the subject of one of two appeals presented here.

### Issues on Appeal

On appeal, Vigil presents three primary contentions of error with various subcontentions: (I) Were the appellant's rights violated by the exclusion of evidence that directly supported his defense of necessity? (1) Did the appellant's tender of proof in support of the defense of necessity satisfy the requisite four-prong test? (2) Did the trial court commit reversible error in denying the defense request to introduce evidence showing the bias of the government's witnesses? (3) Did the trial court commit reversible error by denying the defense request to introduce the complete statement made by the defendant in conjunction with an alleged confession? (4) Did the trial court commit reversible error by denying the appellant's request to introduce the fact of his prior acquittals on related state cases in support of his defense of necessity? and (5) Did the trial court commit reversible error in denying the defense request to introduce evidence to show the violent character of the police officers? (II) Were the appellant's rights violated by the designation of him as a dangerous special offender under 18 U.S.C. § 3575? (1) Was the imposition of an enhanced penalty under the circumstances a vindictive, selective prosecution? (2) Is the provision of the statute prohibiting disclosure of the Notice of Designation to the presiding judge unconstitutional? (3) Is the term "dangerous" as used in the statute so vague as to deny the appellant his due process rights? (4) Are the terms "appropriate" and "not disproportionate" as used in the statute so vague as to deny the appellant his due process rights? (5) Does the "preponderance of information" standard permitted by the statute deny the appellant his due process rights? and (6) Does the admission of hearsay and consideration of old arrests and convictions by the court during the DSO hearing deny the appellant his due process rights? (III) Does this prosecution of the appellant violate his right not to be put in jeopardy twice for the same offense?

### I.

Vigil contends that the trial court erred in excluding certain evidence that directly supported his defense of necessity.

Prior to trial, counsel for Vigil informed the court that one of his defenses to the charge of possession of a firearm by a felon would be the "defense of necessity" or "justification" defense spelled out in *United States v. Gant*, 691 F.2d 1159, 1162–64 (5th Cir.1982) (footnotes omitted):

> To interpose a justification defense to a charge of violating 18 U.S.C. app. § 1202(a)(1), defendant must show (1) that defendant was under an unlawful and 'present, imminent, and impending [threat] of such a nature as to induce a well-grounded apprehension of death or serious bodily injury.' *United States v. Bailey*, 585 F.2d 1087, 1110 (D.C.Cir. 1978) (Wilkey, J., dissenting), *rev'd*, 444 U.S. 394, 100 S.Ct. 624, 62 L.Ed.2d 575 (1980); *see* Model Penal Code § 3.02(1)(a) (1974); (2) that defendant had not 'recklessly or negligently placed himself in a situation in which it was probable that he would be [forced to choose the criminal conduct],' *United States v. Agard*, 605 F.2d 665, 667 (2d Cir.1979); *see* Model Penal Code §§ 2.09(2), 3.02(2) (1974); (3) that defendant had no 'reasonable, legal alternative to violating the law, "a chance both to refuse to do the criminal act and also to avoid the threatened harm."' *United States v. Bailey*, 444 U.S. 394, 410, 100 S.Ct. 624, 634, 62 L.Ed.2d 575 (1980); and (4) 'that a direct causal relationship may be reasonably anticipated between the [criminal] action taken and the avoidance of the [threatened] harm.' *United States v. Cassidy*, 616 F.2d 101, 102 (4th Cir.1979); *United States v. Simpson*, 460 F.2d 515, 518 (9th Cir. 1972); *see* Model Penal Code § 3.02(1), (2) (1974) (requiring an objective appraisal of whether criminal conduct was necessary to avoid the threatened harm)....

As the Supreme Court emphasized in *Bailey,* "one principle of these justification defenses remains constant: if there was a reasonable, legal alternative to violating the law, ... the defense will fail." *Bailey,* 444 U.S. at 410, 100 S.Ct. at 634. In demonstrating that he had no reasonable alternative to violating § 1202, Gant must show that he had actually tried the alternative or had no time to try it, or that a history of futile attempts revealed the illusionary benefit of the alternative.... As the Tenth Circuit has observed:

"The [justification defense] does not arise from a 'choice' of several sources of action; it is instead based on a real emergency. It may be asserted only by a defendant who was confronted with a crisis as a personal danger, a crisis that did not permit a selection from among several solutions, some of which would not have involved criminal acts."

*United States v. Lewis,* 628 F.2d 1276, 1279 (10th Cir.1980), *cert. denied,* 450 U.S. 924, 101 S.Ct. 1375, 67 L.Ed.2d 353 (1981).

■ Vigil's counsel made an offer of proof by oral recitation of proposed testimony and exhibits intended to support Vigil's "defense of necessity." The trial court, following the offer, reasoned that while the evidence might establish the requirement that Vigil had a well-grounded apprehension of death or bodily injury—which, for purposes of the court's ruling, was accepted as true—the defense was not available to Vigil because the other three requirements were lacking of proof. The court ruled that Vigil could not meet the requirement that "[he] had not recklessly or negligently placed himself in a situation in which it was probable that he would be forced to engage in the criminal conduct," and further he failed to show that "[h]e had no reasonable legal alternative to violating the law, and that he had no chance to refuse both to do the criminal act and also to avoid the threatened harm." Finally, the trial court found that Vigil could not meet the fourth requirement of the *Gant* test because there was no direct causal

relationship between the criminal act charged and avoidance of the threatened harm. (R., Vol. II, pp. 4–24.) We agree with the trial court's analysis.

It should be noted that Congress, in enacting the statute making it unlawful for a felon, and others, to receive, possess or transport firearms, found and declared that such unlawful activity:

constitutes (1) a burden on commerce or threat affecting the free flow of commerce, (2) a threat to the safety of the President of the United States and Vice President of the United States, (3) an impediment to or a threat to the exercise of free speech and the free exercise of a religion guaranteed by the first amendment to the Constitution of the United States, and (4) a threat to the continued and effective operation of the Government of the United States and of the government of each State guaranteed by article IV of the Constitution.

18 U.S.C. Appendix § 1201.

In our view, this statutory provision regarding the purpose of § 1201(a) makes it extremely difficult for one to successfully raise the defense of necessity to that charge.

The trial court refused Vigil's effort to introduce evidence of his acquittal of the July 22, 1981, shooting of the two Santa Fe police officers, either as a defense to the possession of a firearm charge or to show the bias of the prosecution's witness, Joe Shattuck, who served as the state prosecutor during Vigil's trial involving the shooting of the two police officers. The government informed the court that Shattuck would testify *only* to the fact that during the trial he heard Vigil testify that he dug up the .38 calibre pistol from his grandmother's yard on July 21, 1981, and kept it in his possession until his arrest on July 23, 1981. The prosecutor also informed the court that the two police officers shot by Vigil would not testify and that there would be no evidence of the shootings or the fact that there were outstanding warrants for Vigil's arrest for murder or arm-

ed burglary. Further, the prosecutor stated that the government's evidence would be confined exclusively to the point that Vigil had been in possession of the .38 calibre pistol at the time of his arrest on July 23, 1981. (R., Vol. II, pp. 32–34.) We observe that in the course of trial, the government scrupulously avoided any references to Vigil's conduct or admissions except those involving his possession of the .38 calibre pistol.

In light of our holding above that Vigil failed to satisfy the *Gant* test, we need not decide Vigil's contentions of error relating to his offer of proof in support of his defense of necessity, the denial of his attempt to introduce evidence of alleged bias of government witnesses, the complete statement made by Vigil in relation to·his alleged confession or admission involving the possession of the .38 calibre pistol given in a state court prosecution, his request for admission of certified copies of his acquittals in the state court proceedings on the charge of murder of Sandoval and the assault with intent to kill the two police officers, and, finally, the denial of his request to introduce evidence tending to show the violent nature of the two police officers he shot. Each of these requests involved evidence intended to prove Vigil's asserted defense of necessity. The trial court properly excluded this evidence upon application and analysis of the four-prong test elicited in *United States v. Gant, supra.*

We therefore affirm Vigil's conviction on the one count of possession of a firearm after four felony convictions.

## II.

Vigil argues that his rights were violated by the trial court's ruling that he be designated as a Dangerous Special Offender (DSO) pursuant to 18 U.S.C. § 3575 and that he suffer the consequences of the enhanced sentence.

### A.

First, Vigil asserts that the imposition of the enhanced sentence, under the circumstances, constituted vindictive, selective prosecution. He predicates this contention on the fact that the government did not file the § 1202(a)(1) charge for a period of almost nineteen months following his July 23, 1981, arrest, and then only after his trials and subsequent jury acquittals in state court where he was charged with the murder of Sandoval and the shooting of the two police officers. Vigil relies on *United States v. Goodwin,* 457 U.S. 368, 102 S.Ct. 2485, 73 L.Ed.2d 74 (1982), which stands for the proposition that a presumption of vindictive prosecution arises when a prosecutor retaliates by filing a particular charge because a defendant exercised a constitutional or statutory right. However, *Goodwin* specifically dealt with a set of circumstances in which the prosecutor made a *pretrial* change in the decision regarding the charges to be brought against the defendant. That, of course, is not our case. Although the *Goodwin* Court noted that "a change in the charging decision made after an initial trial is completed is much more likely to be improperly motivated," *id.* at 381, 102 S.Ct. at 2493, the facts of this case·do not raise such a presumption. Vigil contends that it was the result of the two state court acquittals which prompted the government to pursue the firearm possession charge, in violation of *Blackledge v. Perry,* 417 U.S. 21, 94 S.Ct. 2098, 40 L.Ed.2d 628 (1974). We see no merit in this contention.

The state criminal charges were, in terms of aggravation, much more serious than the possession of firearm charge. One of the state charges was for first degree murder (the Sandoval case) and the other was for assault with intent to kill (the shooting of the two police officers). This fact militates against the presumption of vindictive prosecution. Further, the delay in filing the § 1202(a)(1) charge does not raise such a presumption. In *United States v. Allen,* 699 F.2d 453 (9th Cir.1982), the federal prosecutor, in a case involving an appeal from a charge identical to that involved here, was alleged to have engaged in vindictive prosecution for not having

filed the charge until an unrelated state criminal prosecution against Allen in Oregon had been completed. The prosecutor freely acknowledged that the delay was occasioned by the state prosecution and the sentence Allen might receive if convicted. The court held that such action was not vindictive. *Id.* at 460–61. We agree. Preindictment delay is not a violation of the due process clause of the Fifth Amendment absent a showing of actual prejudice or a showing that the delay was purposefully caused by the government to gain tactical advantage or to harass. *United States v. Jenkins,* 701 F.2d 850, 854 (10th Cir.1983); *United States v. Comosona,* 614 F.2d 695, 696 (10th Cir.1980). Further, a putative defendant's sixth amendment right to a speedy trial arises only after he has become an accused. *United States v. Marion,* 404 U.S. 307, 313, 92 S.Ct. 455, 459, 30 L.Ed.2d 468 (1971). There is no constitutional right to an immediate arrest, even where the government's evidence is strong enough to support probable cause or guilt beyond a reasonable doubt. *United States v. McManaman,* 606 F.2d 919, 923 (10th Cir.1979).

The federal government's determination to withhold prosecution of Vigil on the firearm possession charge pending the completion of the two state criminal jury trials did not constitute selective prosecution. "Selective enforcement is not in itself a federal constitutional violation." *United States v. Brookshire,* 514 F.2d 786, 788–89 (10th Cir. 1975). A defendant bears the burden of proof that the delay caused substantial prejudice to his right to a fair trial and that the delay was for the purpose of gaining a tactical advantage over him. *See United States v. Marion, supra* 404 U.S. at 324–25, 92 S.Ct. at 465–66 (1971). No such proof has been advanced by Vigil in this case.

### B.

▪ Vigil contends that the provisions of 18 U.S.C. § 3575(a) are unconstitutional. Section 3575(a) prohibits disclosure to a trial judge prior to a jury verdict, absent consent of the parties, of the Notice of Designation of the defendant as a DSO. In this case, the government rejected Vigil's request to inform the presiding judge of the allegation prior to return of the jury's verdict. Vigil argues that the statute denying such disclosure is a "[c]ongressional interference with the power of the judiciary to decide the cases brought before it and hence, a violation of the separation of powers doctrine implied by Article 3 of the United States Constitution." Brief of Appellant at 31. The government responds first that the statute prohibits disclosure of the DSO notice and its contents to the judge, and not to the defendant. Hence, only the *judge* and not the defendant has standing to challenge its constitutionality. Here, the notice was served on counsel for Vigil the day it was filed. It was not disclosed to the trial judge until after the jury returned its verdict of guilty. (R., Vol. II, pp. 194–96.) A legal injury must be demonstrated in order to sustain a claimed denial of constitutional rights. *Maestas v. United States,* 341 F.2d 493, 496 (10th Cir. 1965). No injury to Vigil has been demonstrated in this case.

The government argues next that the statute is reasonable in that the purpose of the nondisclosure requirement is to protect the defendant's rights to a fair trial by prohibiting premature disclosure of that which is potentially prejudicial to the defendant. We agree. Such disclosure could—and likely would—work to deny a defendant a fair and impartial trial. The requirement of notice is designed to assure that, before invoking the statute, the prosecutor has made a judgment based on a separate and informed consideration of the two concepts of dangerous and special offender status, and to alert the defendant of the special circumstances upon which the government intends to rely to show that he is dangerous. *United States v. Ilacqua,* 562 F.2d 399, 403 (6th Cir.1977), *cert. denied,* 435 U.S. 906, 98 S.Ct. 1453, 55 L.Ed.2d 497 (1978). Further, the appellant has not demonstrated a sound basis for disclosure to the trial judge before a plea is entered or a guilty verdict returned. The

information is beneficial to the trial judge only in relation to sentencing. Thus, the statute creates no conflict with either the trial processes or the sentencing processes of the district court. Thus, no separation of powers conflict exists.

### C.

██ Vigil contends that the term "dangerous" as used in § 3575(f) is so vague as to deny him his right to due process of law. Vigil relies on *United States v. Duardi*, 384 F.Supp. 874, 885–86 (W.D.Mo.1974), *aff'd on other grounds*, 529 F.2d 123 (8th Cir.1975), which held 18 U.S.C. § 3575(f) unconstitutional for vagueness. Since that date, the appellate courts of five circuits have held otherwise. *See United States v. Schell*, 692 F.2d 672, 675–76 (10th Cir.1982) and cases cited therein. In *Schell*, we stated:

> That Congress might have chosen more precise language does not render a statute unconstitutionally vague ... as long as people of ordinary intelligence need not "guess at its meaning and differ as to its application" .... In this case the issue is whether trial judges who must administer section 3575 can readily apply the concept of dangerousness. In bail and sentencing proceedings, trial judges routinely consider a defendant's propensity to engage in future criminal conduct and the potential danger a defendant poses to society. The concept of dangerousness as defined in section 3575 merely articulates considerations underlying any bail or sentencing decision.... "[D]angerous" is not unconstitutionally vague.

*Id.* at 675.

### D.

██ Vigil argues that the terms "appropriate" and "not disproportionate" are likewise so vague as employed in § 3575(b) as to deny him the rights of due process. We disagree.

18 U.S.C. § 3575(b) provides that if a defendant is found by the trial court to be a dangerous special offender, the court must sentence him "to imprisonment for an *appropriate* term not to exceed twenty-five years and *not disproportionate* in severity to the maximum term otherwise authorized by law for such felony." (Emphasis added.) The statute is intended to provide guidelines for the sentencing judge. Congress clearly intended the sentencing judge to focus on the nature and severity of the underlying felony conviction in conjunction with the defendant's prior misconduct in determining an "appropriate" sentence which must not be "disproportionate" in severity to the maximum term permitted upon conviction of the underlying felony. This is a recidivist statute. Section 3575 and its legislative history render a sound basis to understand, evaluate, and apply the "proportionality" requirement. The original bill did not have the proportionality provision. It would have allowed the sentencing judge to impose a sentence not in excess of 30 years, *regardless* of the underlying felony. Congress decided to include the proportionality requirement in order to assure that the sentence have some relation to the crime for which guilt has been determined underlying the § 3575 enhancement provision. Given the statutory structure, we have no difficulty in upholding the statute against the vagueness challenge posed.

If the record demonstrates, as here, the nature and circumstances of the primary or underlying offense, and if that offense is then considered in conjunction with the defendant's prior record, leading, as here, to a clear conclusion that the offense is of such gravity as to warrant the enhanced sentence, we will support the trial court's determination of an "appropriate" and "proportional" sentence. Given the state of Vigil's prior record, one would be hard pressed to hold that the trial court's enhanced sentence of three years was inappropriate and disproportionate in severity to the maximum term for the underlying felony. *United States v. Schell, supra; United States v. Davis*, 710 F.2d 104, 107–10 (3d Cir.1983), *cert. denied*, —— U.S. ——, 104 S.Ct. 505, 78 L.Ed.2d 695 (1983).

*United States v. Stewart,* 531 F.2d 326, 330–35 (6th Cir.1976).

The terms "dangerous," "appropriate" and "not disproportionate" are not new concepts in criminal law. While recognizing that these terms leave much to the sentencing judge, the guidelines are clear, and the sentencing judge has wide discretion to sentence; furthermore, the DSO provisions provide a substantial check on that discretion through appellate review. *United States v. Davis, supra* at 108–09.

The district court's meticulous findings demonstrate that these terms were clearly understood and applied. (R., Vol. II, pp. 337–44.) The United States Supreme Court has given implied approval to the terms of and use of enhancement-of-penalty statutes. In *Lewis v. United States,* 445 U.S. 55, 100 S.Ct. 915, 63 L.Ed.2d 198 (1980), the Court considered a case involving the enhancement statute with which we are concerned. No challenge to the statute was voiced. In *Baldasar v. Illinois,* 446 U.S. 222, 100 S.Ct. 1585, 64 L.Ed.2d 169 (1980), *reh'g denied,* 447 U.S. 930, 100 S.Ct. 3030, 65 L.Ed.2d 1125 (1980), the Supreme Court, while reversing an enhanced sentence imposed under Illinois' enhancement-of-penalty statute, did so *only* on the basis that the state had relied on a prior uncounseled misdemeanor conviction under which the defendant was not incarcerated. Nothing in that opinion indicated other than that the Illinois enhancement-of-penalty statute was constitutionally valid.

### E.

Vigil contends that the "preponderance of the information" standard authorized by the statute denies him his due process of law. This court has held otherwise in *United States v. Schell, supra* at 679, and in so doing followed the view of four other circuits. *See id.* Since *Schell,* one other circuit has joined in so holding. *See United States v. Davis, supra* at 106–07.

### F.

Vigil argues that the admission of hearsay and the considerations of old arrests

and convictions by the judge during the sentencing hearing denied him his due process rights. We rejected a similar contention in *United States v. Schell, supra* at 675. 18 U.S.C. § 3575(b) specifically provides that "a preponderance of the *information,* including *information* submitted during the trial ... and the sentencing hearing and ... the presentence report ..." may be relied on by the trial court. (Emphasis added.) This statute is consistent with 18 U.S.C. § 3577 and Fed.R. Crim.P. rule 32(c)(2) and (3) dealing with the presentence report. We observe that most of the evidence submitted at the July 26, 1983, DSO hearing was by eyewitnesses, supplemented by certified copies of records of conviction and department of corrections records. Further, Vigil's probation officer testified at the hearing. At no time did counsel for Vigil raise any challenges to the presentence report at the DSO hearing, at sentencing, or on appeal. (R., Vol. II, 265–75, 334–37.)

### III.

Finally, Vigil contends that the instant prosecution violated his right not to be placed in jeopardy twice for the same offense. This contention is without merit.

Vigil's acquittal in the state court prosecution on the charges involving his shooting of the two police officers did not and could not preclude his prosecution by the federal government in federal court on the federal charge of possession of a firearm by a felon. Obviously, the state and federal charges were distinct. Each required proof of elements of the crime, separate and independent of the other. Even if the charges brought by the *two sovereigns* had been similar, however, it is well established that the double jeopardy bar does not control. *E.g., United States v. Wheeler,* 435 U.S. 313, 98 S.Ct. 1079, 55 L.Ed.2d 303 (1978); *Abbate v. United States,* 359 U.S. 187, 79 S.Ct. 666, 3 L.Ed.2d 729 (1959). *See also United States v. Padilla,* 589 F.2d 481 (10th Cir.1978).

WE AFFIRM.