865 F.2d 1260
Unpublished Disposition
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
UNITED STATES of America, Appellee,
v.
Roland HENRY, Appellant.
 No. 88-5064.
 United States Court of Appeals, Fourth Circuit.
 Argued: Nov. 4, 1988.
Decided: Dec. 27, 1988.
 
 John M. Hassett (Office of Harold I. Glaser, on brief), for appellant.
 David Paul King, Assistant U.S. Attorney (Breckinridge L. Willcox, United States Attorney, Beth Perovich Gesner, Assistant U.S. Attorney, on brief), for appellee.
 Before MURNAGHAN, CHAPMAN and WILKINS, Circuit Judges.
 CHAPMAN, Circuit Judge:
 
 
 1
 Roland Henry appeals his conviction of possession of a firearm by a convicted felon in violation of 18 U.S.C. Sec. 922(g)(1). He claims error by the trial court in failing to suppress certain evidence (a firearm) seized at the time of his arrest and in failing to allow appellant to rely upon a defense of duress or necessity. Following the unsuccessful suppression motion and a proffer of evidence in support of the duress and necessity defenses, Henry waived his right to a jury trial and elected a bench trial, at which he was convicted. We find no error, and we affirm.
 
 
 2
 * On October 27, 1987, one Douglas Jones was shot to death in a house located at 1205 East Federal Street, Baltimore, Maryland. The following day two Baltimore police officers went to the address to pick up Curtis Tinsley, a possible witness to the homicide. Sergeant Harding went to the front of the house and Patrolman Benda went to the rear of the house, which had a small backyard and was bounded by a public alleyway. Benda explained why he went to the rear:
 
 
 3
 From past experience at that location its been to our knowledge the house has been used as a shooting gallery for drugs. And, normally, when the police respond to that location for any call if there is anyone inside the house they normally run out the back door, so that's why I went to the rear.
 
 
 4
 There is a two story brick row house at 1205 East Federal Street. The front of the house borders the sidewalk and there are four steps from the sidewalk up to the front door. The house is two rooms deep. The kitchen is located on the rear and it opens into a small backyard. The backyard was surrounded by a fence, except for an opening for a gate. There was no gate present and the backyard and the rear of the house were visible from the public alleyway.
 
 
 5
 The police officers had been advised that the homicide suspect was a tall, thin, black male. When Patrolman Benda arrived in the alleyway, he passed through the opening in the fence and noticed the back door was open. There was no screen door and he looked directly into the kitchen and saw a woman sitting at the kitchen table. There was no one else in the kitchen. He stepped on the back step and at this time Roland Henry came into the room at a rapid pace. Henry had come from the front part of the house and was looking behind him and was trying to put a handgun into the waistband of his pants. At this point Henry was only three or four feet from Patrolman Benda. The patrolman stepped into the room, grabbed the appellant and took the handgun from his waistband. There was a holster for the handgun in the appellant's waistband. Patrolman Benda thought the appellant matched the description of the suspect who had fired the fatal shot in the house the preceding night.
 
 
 6
 At the time of his arrest the appellant gave his permanent address as 823 East Chase Street, which was his mother's residence, but he stated he had been living at 1205 East Federal Street for the past six to eight months. The weapon removed from his waistband was a .357 Magnum, and appellant had three prior felony convictions.
 
 II
 
 7
 The appellant asserts that the officers did not come to 1205 East Federal Street to transport a witness to the Baltimore City Police Station, but that their real intention was to obtain evidence of drug violations, and that they were trying to circumvent the warrant requirements of the Fourth Amendment. This argument has no support in the record. It is undisputed that a homicide had occurred at this address the preceding night and the witness Tinsley verified that the two officers had come to transport him to the police station. A continuing investigation of the homicide would have provided the officers with a legitimate reason to obtain a search warrant, so there would be no need for them to attempt to circumvent the requirements of the Fourth Amendment, as appellant contends.
 
 
 8
 The defense asserts that the entry into the backyard of 1205 East Federal Street without a valid warrant and without proper exigent circumstances was a trespass and violated the Fourth Amendment protection against an unreasonable search, and the handgun, seized from the appellant, should be suppressed. In United States v. Mehra, 824 F.2d 297, 298 (4th Cir.1987), we observed:
 
 
 9
 The fourth amendment protects people rather than places, Katz v. United States, 389 U.S. 347, 353, 88 S.Ct. 507, 512, 19 L.Ed.2d 576 (1967), but the capacity of a person to claim the protection of the fourth amendment depends upon a legitimate expectation of privacy in the invaded place or thing. This requires both that a person have exhibited an actual expectation of privacy and that the expectation be one that society recognizes as reasonable.
 
 
 10
 Originally, since appellant did not give 1205 East Federal Street as his address at the time of his arrest, there was a question as to whether he had standing to raise the claim that the police invaded the curtilage of the house in entering the backyard. However, it was later conceded that he had lived in the house for at least six months and could raise this issue. Henry had no ownership interest in the house, but stated that he shared the residence with Lillian Hector and several other individuals.
 
 
 11
 In United States v. Dunn, 480 U.S. 294, 301 (1986), the court stated:
 
 
 12
 Drawing upon the Court's own cases and the cumulative experience of the lower courts that have grappled with the task of defining the extent of a home's curtilage, we believe that curtilage questions should be resolved with particular reference to four factors: the proximity of the area claimed to be curtilage to the home, whether the area is included within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observation by people passing by.
 
 
 13
 When we apply these factors it is obvious that the backyard was in close proximity to the house, that the backyard was partially enclosed, and that apparently no efforts had been made by the appellant or any of the other residents to protect the area from observation by people passing along the public alleyway. There was no gate in the fence, but simply an opening through which anyone could observe the back of the house and through which anyone could freely walk.
 
 
 14
 In California v. Ciraolo, 476 U.S. 207, 212-13 (1985), the court stated:
 
 
 15
 The protection afforded the curtilage is essentially a protection of families and personal privacy in an area intimately linked to the home, both physically and psychologically, where privacy expectations are most heightened....
 
 
 16
 That the area is within the curtilage does not itself bar all police observation. The Fourth Amendment protection of the home has never been extended to require law enforcement officers to shield their eyes when passing by a home on public thoroughfares.
 
 
 17
 From the testimony in the district court, it is apparent that someone prepared a diagram of the rear of the house, the backyard, the fence and the alleyway, but this diagram was not made a part of the joint appendix. However, it is obvious from the testimony that the backyard was small and the distance from the alleyway to the kitchen door was short. There is no evidence that any of the residents of the house had attempted to screen the rear of the house from observation through the break in the fence. "What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection." Katz v. United States, 389 U.S. 347, 351 (1967). Here there was a view of the rear of the house from the public alleyway. The door at the rear of the house was open and there was no effort by the appellant or any of the other residents to screen the kitchen from public view. Under the facts, Patrolman Benda had the right to go to the back of the house, and from there he could plainly see through the open door as the appellant rushed into the kitchen with his hand on a loaded .357 Magnum. The appellant appeared to be running from Sergeant Harding, who was approaching the front door, and appellant sufficiently matched the description of the homicide suspect to justify Patrolman Benda entering the kitchen, seizing the weapon, and arresting the appellant. There was no error in the district court's refusal to suppress the weapon.
 
 III
 
 18
 Appellant contends that his proffer of evidence made out a viable defense of necessity or duress. In his proffer Roland Henry stated that he shared the residence at 1205 East Federal Street with Lillian Hector and several other individuals; that during his residency, Mrs. Hector had advised him of numerous attempts by individuals to break into the home and of attempts by others to commit robberies; that Mrs. Hector had told him she had obtained a handgun which she normally kept in her upstairs bedroom which was adjacent to appellant's bedroom; that appellant had never possessed a handgun and he had no independent knowledge of how Mrs. Hector obtained the handgun, but she had shown him where the gun was normally kept; that at the time of his arrest by Officer Benda, he was not a suspect in the homicide of Douglas Jones, but that he and the other residents were concerned that the killer might return to the house to threaten, hurt or possibly kill any of the occupants suspected of being a witness; that at the time the Baltimore City Police approached 1205 East Federal Street on August 28, 1987, he was upstairs in his second floor bedroom; that he heard loud noises from the front of the house and noises to the rear of the house; that he heard Mrs. Hector call out from the rear of the house and he determined that there was surprise and fear in her voice; that he believed that the killer had come back or that another robbery or attempted breaking and entering was occurring; that he feared for his own life and for the lives of the other residents; that he went into Mrs. Hector's bedroom and obtained the handgun and ran downstairs to assist Mrs. Hector; that when he ran into the kitchen he observed a uniformed Baltimore city police officer entering the kitchen door, and he immediately discarded the weapon; that he had possession of the handgun for only a matter of seconds.
 
 
 19
 The trial judge reserved ruling on the necessity or duress defense until he had heard all of the testimony. He then considered the appellant's proffer of testimony and found it insufficient as a matter of law. The court found it was not necessary to make credibility findings because the proffered evidence would not make out either defense.
 
 
 20
 Appellant claims that his possession of the firearm should be excused by his defense of necessity or duress. Duress generally refers to unlawful actions that have been taken under threat of imminent death or serious bodily harm, while necessity involves unlawful actions taken because of physical forces beyond the actor's control. Appellant's contentions are closer to duress than to necessity, but we agree with the trial judge that the appellant's proffered testimony did not make out either defense. In United States v. Bailey, 444 U.S. 394 (1980), the court held that the affirmative defenses of either duress or necessity present a question of law as to whether the proffered evidence makes out the defense. Bailey involved a trial of escape from federal custody, and the court found that there was no evidence that the defendants surrendered or offered to surrender at their earliest possible opportunity. "Since we have determined that this is an indispensable element of the defense of duress or necessity, respondents were not entitled to any instruction on such a theory. Vague and necessarily self-serving statements of defendants or witnesses as to future good intentions or ambiguous conduct simply do not support a finding of this element of the defense." Id. at 415.
 
 
 21
 Although appellant and the other residents of 1205 East Federal Street were apprehensive and concerned about the recent homicide, the proffered testimony would not support a finding that appellant was under a threat of imminent death or serious bodily injury at the time he was found in possession of the weapon in the kitchen. If he were concerned for his life, he would have run to meet the policeman at the front of the house, rather than running out the rear. If he were under threat of imminent death or serious bodily harm, he would have been much safer to remain upstairs and away from the threat. If he were acting in great haste because of duress, he still found time to place the holster in his waistband, and he was returning the handgun to the holster, rather than putting it on the table, the chair or some other object, when he realized he was no longer in danger. When a person acts illegally under duress, he must stop the illegal activity at the earliest opportunity. This the appellant did not do.
 
 
 22
 The defenses of duress, necessity or self defense have been recognized in prosecutions against convicted felons for possessing a firearm. In United States v. Panter, 688 F.2d 268 (5th Cir.1982), the defendant was tending bar when a patron, who was a convicted murderer, threatened to kill him and proceeded to stab him in the abdomen with a knife. A fight ensued and Panter reached under the bar for a club he kept there. Instead of a club, he found a pistol which belonged to one of the employees. He shot his assailant, and immediately placed the pistol on the bar and did not handle it again. The court stated:
 
 
 23
 We do not believe the Congress intended to make ex-felons helpless targets for assassins. The right to defend oneself from a deadly attack is fundamental. Congress did not contemplate that Sec. 1202 would divest convicted felons of that right.
 
 
 24
 In sum, we reject the government's argument that the proscription of Sec. 1202(a) is absolute and admits of no self-defense exception. We hold today that where a convicted felon, reacting out of a reasonable fear for the life or safety of himself, in the actual, physical course of a conflict that he did not provoke, takes temporary possession of a firearm for the purpose or in the course of defending himself, he is not guilty of violating Sec. 1202(a)(1).
 
 
 25
 Id at 271-272.
 
 
 26
 In United States v. Gant, 691 F.2d 1159 (5th Cir.1982) the defendant was a convicted felon and operated a small business. He was approached by undercover police officers offering to sell him a machine gun. Gant had been recently robbed and he thought that the present approach might be another attempt, so he obtained a pistol from a filing cabinet and was arrested for possession. The court found that Gant had failed to demonstrate that he had no reasonable alternative to violating Sec. 1202, and that to invoke a necessity defense he must show that he actually tried the alternative or had no time to try it, or that history had shown there was no benefit to the alternative. The court found that Gant had the alternative of calling the police, even though he testified that police had been slow to respond in the past. The Gant court relied upon the language of United States v. Bailey at 410:
 
 
 27
 We need not speculate now, however, on the precise contours of whatever defenses of duress or necessity are available against charges brought under Sec. 751(a). Under any definition of these defenses one principle remains constant: if there was a reasonable, legal alternative to violating the law, "a chance both to refuse to do the criminal act and also to avoid the threatened harm," the defenses will fail.
 
 
 28
 From the proffer there was no proof of an imminent threat of death or serious bodily injury to Henry. He had ample opportunity to refuse to commit the criminal act. He could have called downstairs to find out the cause of Mrs. Hector's alarm or he could have remained quietly upstairs and waited for the situation to develop. There were alternatives to breaking the law, but the appellant neither took the alternatives nor explained his failure. In United States v. Vigil, 743 F.2d 751, (10th Cir.1984), the court allowed a proffer of testimony on the necessity defense, but found that it had not been made out because, in addition to other deficiencies in the proposed proof, the defendant did not show that he had no legal alternative to violating the law. The court, after quoting the reasons Congress gave for enacting the statute, observed: "In our view, this statutory provision regarding the purpose of Sec. 1202(a) makes it extremely difficult for one to successfully raise the defense of necessity to that charge." Id. at 756. We agree that the defense of necessity is difficult, but it is not impossible upon a proper factual showing. Henry failed in his effort to make such a showing of either duress or necessity.
 
 
 29
 AFFIRMED.