**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**May 7, 2007**

**Elisabeth A. Shumaker**
**Clerk of Court**

<u>PUBLISH</u>

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.                                                              No. 06-5027

JUAN DESHANNON BUTLER,

Defendant - Appellant.

---

**Appeal from the United States District Court**
**for the District of N.D. Oklahoma**
**(D.C. No. 05-CR-4-01-CVE)**

---

Douglas Edward Snow, Assistant United States Attorney (David E. O'Meilia, United States Attorney, and Kevin Danielson, Assistant United States Attorney, on the briefs) Tulsa, Oklahoma, for Plaintiff - Appellee

Robert A. Ridenour, Assistant Federal Public Defender (Paul D. Brunton, Federal Public Defender, on the briefs), Tulsa, Oklahoma, for Defendant - Appellant

---

Before **O'BRIEN, SEYMOUR** and **TYMKOVICH**, Circuit Judges.

---

**O'BRIEN**, Circuit Judge.

A jury convicted Juan Butler of being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1), and an armed career criminal in possession of

a firearm and ammunition, in violation of 18 U.S.C. § 924(e)(1). The district judge refused Butler's request to instruct the jury on justification, but made a downward departure from the sentencing guidelines in recognition of the unique circumstances of this case. Butler appeals. We affirm.

*I. Background*

On October 27, 2004, Federal Bureau of Investigation Agent Matt Lotspeich and Tulsa Police Detective Paul Hutter were investigating an armed robbery. Believing Butler might have some information about suspects, the officers met with him at his apartment and arranged to again meet with him for additional questioning. On November 4, 2004, that meeting occurred in an unmarked police car outside Butler's apartment. During the meeting Butler went into his apartment and returned to the car with a loaded gun. He said he needed to be rid of the gun.

At trial, Butler testified about the circumstances of his possession of the gun. For purposes of this appeal we accept his testimony as true and relate his version of events. One day, when his wife and daughter were home, there was a knock at the back door of the apartment. When he opened the door, two men were outside. Butler knew one, Jermaine Link, but not the other, later identified as Rudy Gomez. He admitted the men because he knew Jermaine, who said he had a business proposition. When Butler asked the nature of the proposition, Gomez explained he was having a problem with a person named Alvin. Gomez

said he had been assaulted by Alvin and wanted Butler to kill Alvin. Gomez pulled out a gun and told Butler to use it to murder Alvin. Shocked and afraid, Butler agreed. He felt he had no choice; if he refused, Gomez would shoot him and his family. His fear was well founded because Gomez pointed the gun at Butler while explaining the Alvin problem, changed the tone of his voice, and acted as if he had another gun in his pants.

Although Butler knew it was illegal for him to possess the gun, he did not take it to the authorities because Gomez and Jermaine would be coming back and he would be in danger if they discovered it was missing. The next evening, Gomez and Jermaine returned to the apartment. They drove Butler to Alvin's house and parked inconspicuously behind it to discuss the layout. Butler acquiesced because he wanted to avoid violence against him and his family.

Gomez wanted an "airtight alibi," such as being incarcerated, so he instructed Butler to delay the murder until he could make such arrangements. In the interim Gomez stayed in contact with Butler via cell phone. Knowing Gomez and others believed cell phones operated by the local mobile phone company were constantly monitored, Butler tried to "spill information" – that is, mention information linking Gomez to the plot – hoping Gomez would believe he could be connected to the murder regardless of what alibi he might arrange. Thus, Butler hoped, Gomez would call off the plot.

Finally, Gomez changed his mind about the murder. When he so advised

Butler he allowed Butler to keep the gun. At this point, Butler decided to turn the gun over to the authorities. Knowing the agents (with whom he had now established a relationship) were due to visit him again, he waited for them to come to his apartment to surrender the gun. The elapsed time between aborting the murder and surrendering the gun was two to four days; Butler possessed the gun for a total of four to six weeks.

## II. Standard of Review

If supported by the evidence and the law, a criminal defendant is entitled to jury instructions concerning his theory of defense, *United States v. Visinaiz*, 428 F.3d 1300, 1308 (10th Cir. 2005), *cert. denied*, 126 S.Ct. 1101 (2006), in this case, justification. "'For the purposes of determining the sufficiency of the evidence to raise the jury issue, the testimony most favorable to the defendant should be accepted.'" *United States v. Al-Rekabi,* 454 F.3d 1113, 1121 (10th Cir. 2006) (quoting *United States v. Scull*, 321 F.3d 1270, 1275 (10th Cir. 2003)). But, "it is essential that the testimony given or proffered meet a minimum standard as to each element of the defense so that, if a jury finds it to be true, it would support an affirmative defense—here that of duress or necessity." *United States v. Bailey*, 444 U.S. 394, 415 (1980). When the trial judge refuses to instruct on a specific defense, we review for an abuse of discretion. *Al-Rekabi,* 454 F.3d at 1121.

*III. Discussion*

In this case, Butler sought an instruction on a justification defense.[1]  Such a

defense requires the defendant to demonstrate the following:

> (1) that defendant was under an unlawful and present, imminent, and impending [threat] of such a nature as to induce a well-grounded apprehension of death or serious bodily injury;
> (2) that defendant had not recklessly or negligently placed himself in a situation in which it was probable that he would be [forced to choose the criminal conduct];
> (3) that defendant had no reasonable, legal alternative to violating the law, a chance both to refuse to do the criminal act and also to avoid the threatened harm; and
> (4) that a direct causal relationship may be reasonably anticipated

---

[1] Courts have used the terms duress, necessity, and justification interchangeably.  *See United States v. Leahy*, 473 F.3d 401, 406 (3d Cir. 2007).  This may be due to the development of the defense by drawing upon common law.  *Id.*  "While the defense of duress covered the situation where the coercion had its source in the actions of other human beings, the defense of necessity, or choice of evils, traditionally covered the situation where physical forces beyond the actor's control rendered illegal conduct the lesser of two evils."  *Bailey*, 444 U.S. 394, 409-410 (1980).  In modern times, "'[t]he traditionally separate defenses of necessity and duress have become increasingly blurred in modern decisions, to the point of merger.'"  *United States v. Holliday*, 457 F.3d 121, 127 (1st Cir. 2006), *cert. denied*, 127 S.Ct. 1317 (2007) (quoting *United States v. Nelson-Rodriguez*, 319 F.3d 12, 40 n.9 (1st Cir. 2004)).  The defense requested by Butler, as we defined it in *United States v. Vigil*, 743 F.2d 751, 755 (10th Cir. 1984), is spoken of in terms of justification and necessity.  We use that terminology in this opinion.  *Leahy*, 473 F.3d at 406 ("[E]ase in administration favors treating [the common law defenses of duress, necessity, and self-defense], in a federal felon-in-possession case, under a single, unitary rubric: justification."); *United States v. Salgado-Ocampo*, 159 F.3d 322, 327 n.6 (7th Cir. 1998) ("[N]ecessity, justification, duress and self-defense are interchangeably lumped together under the rubric of the justification defense."); *United States v. Gomez*, 92 F.3d 770, 774 (9th Cir. 1996) (where defendant argued he was entitled to a duress or necessity defense, the Ninth Circuit noted such cases "have almost always been analyzed in terms of justification," and analyzed accordingly).

between the [criminal] action taken and the avoidance of the [threatened] harm.

*Vigil*, 743 F.2d at 755 (citations and internal quotations omitted).

Another principle overarches and qualifies the four factors announced in *Vigil*. It is temporal – if justification is established by evidence of all four factors, the defense is available only so long as all of those factors continue to exist. *Al Rekabi*, 454 F.3d at 1123. We rest our decision on the first of *Vigil's* four factors.[2]

A. <u>Imminent and Impending Threat of Death or Serious Bodily Injury</u>

To satisfy the first prong of a justification defense, "[t]he defendant must show an imminent danger – a real risk of death or serious bodily injury." *Al-Rekabi*, 454 F.3d at 1125.[3] And the imminent danger must persist throughout the possession. *Id.* at 1125-26. The Supreme Court's decision in *Bailey* is both instructive and compelling.[4] The Court clearly conditioned a justification

---

[2] "If, as we here hold, an affirmative defense consists of several elements and testimony supporting one element is insufficient to sustain it even if believed, the trial court and jury need not be burdened with testimony supporting other elements of the defense." *Bailey*, 444 U.S. at 416.

[3] In *Al-Rekabi* the defendant argued he should be entitled to a justification instruction because he had taken the firearm from his 12-year-old brother. *Id.* Although the situation was "*potentially* very dangerous," the defendant was not entitled to a justification instruction because "the danger . . . was not clearly 'imminent.'" *Id.* (emphasis added).

[4] In *Al Rekabi* we analogized the elements of the escape in *Bailey* to the elements of a felon in possession of a weapon. *Id.* at 1124.

instruction on the defendant's proof of abandonment of illegal conduct at the earliest possible opportunity. In *Bailey*, prison escapees requested an instruction on duress or necessity, claiming their escape from prison was due to intolerable conditions. Reversing the Court of Appeals for the District of Columbia, the Supreme Court affirmed the district court's refusal to instruct the jury on such a defense. "[W]here a criminal defendant is charged with escape and claims that he is entitled to an instruction on the theory of duress or necessity, he must proffer evidence of a bona fide effort to surrender or return to custody as soon as the claimed duress or necessity had lost its coercive force." *Bailey*, 444 U.S. at 415. Because the *Bailey* defendants failed to turn themselves in at the "earliest possible opportunity," which was "an indispensable element of the defense of duress or necessity," they were not entitled to the instruction.[5] *Id.*

Butler's account of the facts – relating Gomez's threatening manner, his tone of voice, and pointing a gun at Butler – arguably presented a jury question as to a present, imminent and impending threat of death or serious bodily injury during the initial meeting. But as Butler's narrative continued the possible inference of imminent danger eroded to the point where, as the trial judge

---

[5] "The requirement of a threshold showing on the part of those who assert an affirmative defense to a crime is by no means a derogation of the importance of the jury as a judge of credibility. Nor is it based on any distrust of the jury's ability to separate fact from fiction. On the contrary, it is a testament to the importance of trial by jury and the need to husband the resources necessary for that process by limiting evidence in a trial to that directed at the elements of the crime or at affirmative defenses." *Bailey*, 444 U.S. at 416.

decided, the evidence, considered as a whole and viewed most charitably to the defendant, simply did not sustain the required inference. It is a working example of the proper exercise of the trial judge's role as gatekeeper – deciding if the evidence passes the threshold for a justification instruction.

Butler failed to relinquish the gun at the "earliest possible opportunity." The standard announced in *Al-Rekabi*, while not unforgiving, is demanding. It appears the district court was not convinced, nor are we, that "imminent" danger persisted the entire four to six weeks Butler possessed the firearm. Certainly it was not an abuse of discretion for the district court to so consider the evidence. But, one need not dwell on lingering danger because Gomez called off the murder plot and told Butler to keep the gun. At that point the danger had clearly dissipated, yet, according to Butler's undisputed testimony, he continued to possess the gun for two to four days. Objectively considered, the duress or necessity, even if initially present, had "lost its coercive force." *See id.* at 415. Since *Bailey's* predicate for a justification instruction, presently extant coercive force, was not met the instruction was properly refused.

Butler cites several cases from other circuits arguing for a contrary result. Of course those cases, even if persuasive, cannot substitute for Tenth Circuit precedent. But they are inapposite or only marginally relevant in any event.

The first is *United States v. Deleveaux*, 205 F.3d 1292 (11th Cir. 2000).[6]  In *Deleveaux*, the government and the defendant presented different version of events.  According to Deleveaux:  his wife was under attack from a neighbor wielding a firearm; he reacted by obtaining a 9mm handgun from a place she had hidden it in the attic and exchanged fire with the intruder; he knew his wife owned a gun and where she kept it in her house (they had been estranged and living apart when he came to that knowledge – he later moved back into the home); he had never handled the gun until the day of the incident; after the altercation, he placed the gun back in the attic.  *Id.* at 1294.  The trial judge thought a justification instruction "was a 'close question.' . . . [but] decided to 'err [ ] on the side of giving the defendant the opportunity to argue this matter to the jury.'"  *Id.* at 1295.  The government, having obtained a conviction, did not appeal from that decision.  The only issue before the Seventh Circuit was whether justification is an affirmative defense, placing the burden of proof on the defendant (the court concluded it was).  Since the propriety of the justification instruction given by the trial judge was not argued or decided in *Deleveaux* and the issue the *Deleveaux* court did decide is not present here, we fail to see the

_____

[6] "Since the language of § 922(g)(1) prohibits a convicted felon from even possessing a firearm, the first question is whether a justification defense is available to a § 922(g)(1) charge.  We join the other circuits addressing this issue and hold that the defense of justification may be available to a § 922(g)(1) charge."  *Deleveaux*, 205 F.3d at 1297 (citations omitted).  "However, we also agree with those circuits that this defense is available in § 922(g)(1) cases in only extraordinary circumstances."  *Id.* (citations omitted).

relevance of that case.

Butler next points to *United States v. Paolello*, 951 F.2d 537 (3d Cir. 1991). Paolello testified he was attacked, disarmed his assailant, and ran away with the gun – an act of self preservation. A police officer on the scene saw Paolello fleeing down an alley and ordered him to stop. Paolello discarded the gun but kept running until apprehended by another officer. *Id.* at 538-39. The district court refused to give a justification instruction; the Third Circuit reversed. *Id.* at 539, 544. The court of appeals applied the equivalent of our four-part *Vigil* test, *Id.* at 540, and adopted the rule "an interdicted person may possess the firearm no longer than absolutely necessary." *Id.* at 541 (citations omitted). It concluded Paolello was entitled to a justification instruction

> "[b]ecause we must accept in the procedural posture of this case Paolello's version of the facts in the record, it appears that Paolello did not maintain possession of the weapon any longer than absolutely necessary. Thus, even if we find Paolello's testimony unpersuasive, his credibility should be judged by the jury."

*Id.* at 543. *Paolello* hardly equates with this case. First, there is no factual dispute here, as there was in Paolello. We accept Butler's version of events, without regard to conflicting evidence. Second, possession of a firearm for a few moments in an adrenalin rush while fleeing from a violent encounter is a world apart from Butler's continued possession of the firearm for weeks and especially for a period of two to four days after any credible threat had been eliminated.

Finally, Butler refers us to *United States v. Gomez*, 92 F.3d 770 (9th Cir.

-10-

1996). Gomez was acquitted of state law charges. Knowing he would soon be released from the jail, one of the other inmates solicited Gomez to kill a number of people in exchange for substantial sums of money. Gomez reported the solicitation to the guards and cooperated with law enforcement in gathering evidence against the inmate. *Id.* at 772. Although the government promised to keep his identity secret and to protect him, it failed; Gomez's full name was disclosed in the indictment against the inmate. Gomez began to receive written and verbal death threats and learned there was a contract out for his life. When he reported this to federal agents, they refused to take him into protective custody. *Id.* at 773. He also went to the sheriff, his parole officer, and local churches for help. He went to the newspaper with his story. Gomez moved from one house to another, and even went homeless in an attempt to avoid danger. Finally, Gomez went to his parole officer and lied, claiming he was using illegal drugs. That led to his incarceration, where he received a written death threat from an inmate. Upon release, he received yet another death threat. On the same day, Gomez took possession of a 12-gauge shotgun to protect himself. *Id.* at 773-74. Two days later, federal agents served him with a subpoena and found him with the shotgun. The Ninth Circuit reversed Gomez's conviction because the district court failed to instruct the jury on justification. *Id.* at 778.

Butler argues his predicament was on the same order as that of Gomez. Unlike Butler, however, Gomez received several death threats, both in person and

in writing. *See id.* at 776. Gomez behaved as if he was concerned for his safety – he moved from home to home and sought protection from federal agents, the local sheriff, and his parole officers. *See Al-Rekabi*, 454 F.3d at 1125 (considering defendant's response to alleged threat as evidence of whether the defendant believed the threat to be imminent). Butler did nothing of the sort and after the murder plot was called off, Butler conceded he was no longer afraid. In *Gomez* the critical question, whether the danger "had lost its coercive force," was sufficiently in doubt to require jury resolution. The factual landscape here is entirely different.

We must take care not to transform the narrow, non-statutory justification exception to the federal anti-felon law into something permitting a felon to possess a weapon for extended periods of time in reliance on some vague "fear" of street violence. Indeed, "[i]f ex-felons who feel endangered can carry guns, felon-in-possession laws will be dead letters." *United States v. Perez*, 86 F.3d 735, 737 (7th Cir. 1996). By insisting that the evidence of a threat of serious injury or death is actually "present, imminent and impending," we will avoid this undesirable result. *See Vigil*, 743 F.2d 755.

The district court did not err in denying a justification instruction because Butler's evidence was insufficient to permit the jury to reasonably find the continuing urgent danger required by our cases. The circumstances of Butler's

case are better considered as mitigation of punishment[7] than exoneration of criminal behavior.

B. Reasonable, legal alternatives to violating the law

Butler failed on the first prong of the *Vigil* test and that is sufficient to end the matter. However, to be thorough we address the third prong in response to Butler's arguments. It requires Butler to show he had no reasonable, legal alternatives to possessing the gun. *Id.* at 755. *Gomez* serves as a possible example of an arguable case for a thorough and principled exhaustion of available legal alternatives to illegal possession of a firearm – one grounded in self defense. By comparison, Butler's evidence clearly appears wanting. Nevertheless, he claims it to be sufficient, relying on *United States v. Newcomb*, 6 F.3d 1129 (6th Cir. 1993). *Newcomb* provides cold comfort.

Newcomb was charged with unlawful possession of a firearm and ammunition. *Id.* at 1130. A police officer observed a group of three people in an alley. *Id.* at 1130-31. Someone the officer identified as the tallest of the three placed a two foot long dark object into an abandoned couch in an alley. When the officer patted down Newcomb, he found four 12-gauge shotgun shells. He then

_____

[7] In a global view of the criminal justice process, the fact a felon voluntarily, albeit belatedly, surrendered a firearm to the police is not irrelevant. Surely it is a factor for prosecutors in the exercise of charging discretion. It is also a consideration for judges in the exercise of their discretion in crafting a reasonable sentence. *See United States v. Booker*, 543 U.S. 220, 260-62, 265 (2005). That safety valve is evident here, where the court made a downward departure.

found a sawed-off 12-gauge shotgun in the couch. The officer identified Newcomb, the tallest person, as the one who put the gun in the couch. Defense witnesses testified Newcomb had gone out with others to find and dissuade his girlfriend's son, who was in a murderous rage, from killing another with a shotgun. They found the son and Newcomb managed to wrest the gun from him. After Newcomb removed the shells, the son again took possession of the gun and placed it in the couch, vowing to get another gun to shoot his intended victim.

In *Newcomb*, as it does here, the government argued the defendant had other, plausible alternatives to violating the statute – including having someone else possess the weapon or calling law enforcement to handle the problem. *Id.* at 1137. The Sixth Circuit held the jury might reasonably find Newcomb had no reasonable alternatives to illegal possession of the gun if it found he was faced with an *emergency* situation. But in doing so, the *Newcomb* court noted that usually, when a defendant's conduct spans a period of time, there are other alternatives to the illegal conduct.

That point was not lost here. According to the district court:

[W]e don't even have to assume that he could have gone to the police. He met with the police on October 27th and didn't mention it. And it wasn't until the second meeting that he said I have something to give you. The defendant had six weeks to contact the police and say, look, someone wants to kill someone else; they gave me a gun to do it; I want to turn them in, and along the way, I want to give you the gun. He did not do that. He sat back and continued to possess the gun for six weeks.

-14-

(R. Vol. III at 172-73.)

Butler conceded he never asked the officers for protection from Gomez. In explanation for that failure he claimed not to trust the officers to protect him and his family. He claimed such protection only happens "in the movies." (*Id.* at 91.) We cannot fully imagine the difficulty faced by someone in the situation Butler described. Nevertheless, Congress has declared that felons are not to be in possession of firearms. 18 U.S.C. § 922. Although, along with other courts, we have applied an exception to this general rule,[8] the exception is narrow and is appropriate only in extraordinary circumstances. *See, e.g., Al-Rekabi*, 454 F.3d at 1121 ("The necessity defense is a narrow exception to stringent federal firearms laws."); *Deleveaux*, 205 F.3d at 1297 ("[T]his defense is available in § 922(g)(1) cases in only extraordinary circumstances."); *Paolello*, 951 F.2d at 542 ("The restrictive approach [to the justification defense] is sound.").

Butler's experiences may well have led him to be hesitant in trusting law enforcement to keep him and his family safe,[9] but such distrust does not eliminate prompt relinquishment of the gun and disclosure of the circumstances to the police as a reasonable legal alternative. Without substantial and compelling

---

[8] *See Al-Rekabi*, 454 F.3d at 1122 n.7 (noting courts have assumed a justification defense applies, although the statute does not explicitly provide for such a defense).

[9] Butler explained he "didn't believe in the protection of the police force," and explained he believed Gomez's "homeboys" could get to him even if the police arrested Gomez. (R. Vol. III at 95.)

-15-

proof, as in *Gomez*, distrust of officials is much too convenient as a *post hoc* rationalization for illegal possession. *Cf. United States v. Harper*, 466 F.3d 634, 648 (8th Cir. 2006) (where a defendant claimed he had no faith in law enforcement because he was threatened by a deputy, the court applied the rule "a defendant's subjective belief that going to law enforcement would prove futile is insufficient to meet the objective standard that there was no reasonable, legal alternative to violating the law."), *cert. denied*, 127 S.Ct. 1504 (2007); *United States v. Hudson*, 414 F.3d 931, 934 (8th Cir. 2005) (where defendant claimed to be afraid of a "rogue" police officer, "[o]ne reasonable alternative for [defendant] was to report her alleged fear of the rogue officer to responsible law enforcement authorities."), *cert. denied*, 126 S.Ct. 1769 (2006); *Gomez*, 92 F.3d at 777 (noting that defendant sought help from federal agents, the sheriff, his parole officer and local churches).

Difficult choices may emanate from federal firearms laws, which "impose something approaching absolute liability." *United States v. Adkins*, 196 F.3d 1112, 1115 (10th Cir. 1999) (internal quotations omitted). It is one of the burdens of a felony conviction. While Butler's alternatives may have been uncomfortable, a prompt surrender of the firearm was not impossible.

AFFIRMED.