**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**July 17, 2006**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

　　Plaintiff - Appellee,

v.

HAYDAR HAMEED AL-REKABI,

　　Defendant - Appellant.

No. 03-4158

**Appeal from the United States District Court**
**for the District of Utah**
**(D.C. No. 2:02-CR-0489-TC)**

Michael S. Lee, Assistant United States Attorney (Paul M. Warner, United States Attorney on the briefs) Salt Lake City, Utah, for Plaintiff - Appellee.

Scott Keith Wilson, Assistant Federal Public Defender (Steven B. Killpack, Federal Public Defender on the briefs), Salt Lake City, Utah, for Defendant - Appellant.

Before **BRISCOE, O'BRIEN**, Circuit Judges, and **HEATON**, District Judge.[*]

**O'BRIEN**, Circuit Judge.

---

[*] The Honorable Joe Heaton, United States District Judge for the Western District of Oklahoma, sitting by designation.

A jury convicted Haydar Hameed Al-Rekabi of possession of a stolen firearm in violation of 18 U.S.C. § 922(j). The district court instructed on constructive possession but refused necessity and fleeting possession instructions. Al-Rekabi argues the trial court's use of constructive possession was too expansive and its view of justification defenses too restrictive. In affirming, we clarify the role of constructive possession and urge the parsimonious use of justification instructions.

## Background

The preliminary facts are undisputed. On February 16, 2002, when Al-Rekabi's twelve year-old brother, Hussein, and a friend, Joey, were playing basketball they noticed a "clip" (actually a magazine) from a pistol in a parked vehicle. That led to the discovery of the pistol and another magazine. After stealing them, the boys hid them in an abandoned house, but retrieved them when they became worried the police were looking for the pistol. Hussein took the apparently unloaded pistol and headed home with it in his waistband, along with the magazines of ammunition. In transit, Al-Rekabi discovered his younger brother was carrying a weapon. From that point on the trial evidence varies dramatically.

According to Hussien, Al-Rekabi, who was a passenger in a car driven by his friend Kenny Whitfield, became angry when he learned Hussein was carrying a pistol and smacked him on the neck. He told Hussein to give the pistol to

Whitfield, which Hussein did. Al-Rekabi testified he became angry when Hussein told him he had a pistol and jumped out of the car and started slapping and kicking his brother who still had the weapon. According to Al-Rekabi, Whitfield then left the vehicle, separated the brothers, took the pistol from Hussein and drove away. According to Whitfield, he was not in a vehicle with Al-Rekabi on February 16, 2003, and could not drive because he did not have a driver's license. Whitfield did testify, however, that during this period Al-Rekabi told him he had taken a pistol from his younger brother and, when Whitfield offered to buy it, said he would give it to him. According to Whitfield, Al-Rekabi then left to retrieve the weapon, but returned stating he could not find it. Whitfield never saw Al-Rekabi with a handgun.

That same day, the theft of a pistol was reported to the Salt Lake City Police Department. The owner's girlfriend told the police she believed some friends of her son might have it. On February 19, 2002, Hussein was interviewed at his school by Salt Lake City Police Officer Fred Ross. According to Officer Ross, Hussein admitted to stealing the pistol. On his way home with it, Al-Rekabi saw him, took the pistol from him and put it in a heater vent in their house so neither of them would get into trouble. Officer Ross took Hussein to the Al-Rekabi home. They were met there by Officer C.J. Johnson. Their search for the pistol was futile. According to Hussein, the police never entered his home.

It is uncontested that while Officers Ross and Johnson were at the house,

another of Al-Rekabi's brothers, Mohammed, and his mother met them. A conversation among the Officers, Mohammed, and his mother ensued. According to both accounts, the mother and Mohammed called Al-Rekabi on his cell phone and told him the police were looking for the pistol. During the call, according to Mohammed, Al-Rekabi told Mohammed that Whitfield would call him with an address where Mohammed could meet Whitfield to retrieve the weapon. A short time later Whitfield called Mohammed with the address. Mohammed left, unaccompanied, to retrieve the weapon. Mohammed returned home and gave the pistol to Officer Johnson.[1] According to Officer Ross, Mohammed returned with the loaded pistol within seven to ten minutes. Officers Ross and Johnson then accompanied Mohammed to Joey's house to retrieve a second magazine.

Later that day, Al-Rekabi was interviewed by Utah Department of Corrections Officer David Olive. According to Officer Olive, Al-Rekabi admitted to taking a pistol from Hussein, but subsequently decided to get rid of it because he knew he could not possess it.

Some time later, Al-Rekabi contacted his probation officer, Julie Schirle, to notify her that he had taken a pistol away from his brother and given it to someone else. According to Schirle, Al-Rekabi told her the police had questioned him at his home and he did not think anything further would happen. Al-Rekabi

---

[1]Al-Rekabi also testified that he spoke with Officer Ross and denied ever possessing the weapon. Officer Ross claims he never spoke with Al-Rekabi on the phone.

told Schirle he had not called her earlier or given the pistol to her because he knew he was not allowed to possess a pistol under the terms of his probation.[2]

On August 14, 2002, Al-Rekabi was charged with possession of a stolen firearm.

## Discussion

### I. Jury Instructions

#### A. Constructive Possession

The doctrine of constructive possession is critical in contraband cases, particularly those involving controlled substances and weapons, because it allows the law to reach beyond puppets to puppeteers. Thus, "constructive possession exists where the defendant knowingly has the power to exercise control or dominion over the item." *United States v. Lopez*, 372 F.3d 1207, 1212 (10th Cir. 2004); *see also United States v Ledford*, 443 F.3d 702, 713-717 (10th Cir. 2006) (discussing the "knowing" requirement). Or, as we have stated in the case of narcotics, "constructive possession [is] an appreciable ability to guide the destiny of the [contraband]." *United States v. Verners*, 53 F.3d 291, 294 (10th Cir. 1995) (internal quotations and citations omitted). On at least three prior occasions we

_____

[2] According to Schirle, under the terms of his probation, Al-Rekabi was required to report the possession of the pistol "within 48 hours or it's a violation of his probation." (R. Vol. IV. at 36.) Although Schirle could not remember the precise date of Al-Rekabi's report, Al-Rekabi told Schirle he had already spoken with the police, which did not occur until February 19, more than forty-eight hours after the incident with Hussein.

have upheld jury instructions permitting a jury to find constructive possession where one individual had the ability to control another person who actually possesses contraband.[3]  Constructive possession may be proved by circumstantial evidence.  *United States v. Mills*, 29 F.3d 545, 549 (10th Cir. 1994).  But only when there is some evidence "supporting at least a plausible inference that the defendant had knowledge of and access to the weapon or contraband," will a conviction based upon constructive possession be upheld.  *Id*. at 550.

"We examine jury instructions as a whole and review *de novo* the propriety of an individual jury instruction to which objection was made at trial."  *United States v. Cooper*, 375 F.3d 1041, 1049 (10th Cir. 2004).  If an instructional error occurred, we must determine whether the conviction must be set aside because the "error had a substantial influence on the outcome of the trial or leaves us in grave doubt as to its influence on the verdict."  If the error is harmless the conviction will stand.  *Id.*; *United States v. Cota-Meza*, 367 F.3d 1218, 1221 (10th Cir. 2004).

Al-Rekabi objected to any constructive possession instruction and now

_____

[3] *See Lopez*, 372 F.3d at 1211 ("A person who, although not in actual possession, knowingly has both the power and the intention at a given time to exercise dominion or control over a thing, either directly or through another person or persons, is then in constructive possession of it."); *United States v. Zink*, 612 F.2d 511, 516 n.1 (10th Cir. 1982) (same); *Amaya v. United States*, 373 F.2d 197, 199 (10th Cir. 1967) ("constructive possession meant that although the narcotic may be in the physical possession of another, the defendant knowingly had the power of exercising control over it; . . . ; and that 'power to produce or dispose of the narcotic was evidence of such control.'").

contends the trial court erred in giving such an instruction. He claims 1) the evidence did not support the instruction, and 2) if an instruction was justified, the one delivered to the jury was misleading and confusing. We consider those claims in turn.

This jury was presented with a factual smorgasbord; most versions involved Al-Rekabi's actual or constructive possession of the pistol: 1) Hussein complied with Al-Rekabi's directive to give the pistol to Whitfield (Hussain's trial version), 2) Al-Rekabi took the pistol from Hussein and stashed it (Whitfield's trial version based on statements Al-Rekabi made to him and Hussein's version as related to Officer Fred Ross), 3) Al-Rekabi took the pistol from Hussein and gave it to another person (Al-Rekabi's version as related to a Utah corrections officer and a probation officer), or 4) Whitfield took the pistol from Hussein and drove off with it (Al-Rekabi's trial version). There was evidence placing the pistol in Al-Rekabi's house and evidence that Al-Rekabi continued to control the destiny of the pistol for some time after the encounter with Hussein. When the police were looking for the pistol, Al-Rekabi spoke to Mohammed on the cell phone. Mohammed left and returned a short while later with the loaded pistol.

The evidence, while conflicting, was clearly sufficient to support a constructive possession instruction. The district court did not err in that respect. However, the instruction given is somewhat problematic.

The trial judge concluded that merely directing another to dispose of the

pistol, even if the other complied, was insufficient for constructive possession. Therefore, she instructed the jury "[t]o establish constructive possession, the government must prove that the defendant had the right to exercise physical control over the firearm, and knew that he had this right, and that he intended to exercise physical control over the firearm at some time." (R. Suppl. Vol. I, Doc. 53.) The instruction was incorrect in several respects.

First, framing the issue as a "right to exercise physical control" was error and needlessly confused the jury, prompting it to inquire whether constructive possession includes "the ability to have [the pistol] moved by another person."[4] Interestingly and in spite of the jury instruction, the jury put its finger on the issue. The bedrock of constructive possession — whether individual or joint, whether direct or through another person — is the *ability* to control the object. It has nothing to do with a *right* to control.

Also incorrect was the mention of physical control because it implied an element of actual possession, which our cases do not require. *See United States v. Simpson*, 94 F.3d 1373, 1380 (10th Cir. 1996) ("Possession need not be actual,

---

[4] The jury asked the following question during deliberations:

> Under constructive possession it states the defendant had "the right to exercise physical control over the firearm." What is physical control? Does it mean the person has the ability to touch it, or does it mean he has the ability to have it moved by another person[?]

(R. Vol I., Doc. 49 at 3.)

but may be constructive."); *Cardenas*, 864 F.2d 1528, 1533 (10th Cir. 1989) ("possession in fact is not a prerequisite [for] conviction, constructive possession being sufficient."); *United States v. Massey*, 687 F.2d 1348, 1354 (10th Cir. 1982) ("Constructive possession is possession in law but not in fact.").

Finally, it was error to include the additional requirement of an intent to control the pistol. As we recently explained, such intent is not required. *Ledford*, 443 F.3d at 714 (citing *United States v Colonna*, 360 F.3d 1169, 1179 (10th Cir. 1994)) (reconciling our cases). A knowing ability to control is all constructive possession requires, even in a joint occupancy situation. *Ledford*, 443 F.3d 714; *Colonna*, 360 F.3d at 1179.[5]

The district court appears to have been concerned that constructive possession could sweep innocent as well as criminal conduct into the net. That concern is theoretically possible but it does not warrant redefinition of constructive possession.[6] Assuming a vanishing point may exist does not suggest

---

[5] It is undisputed that Al-Rekabi exercised his ability to control the movement of the stolen pistol.

[6] There are general legal protections afforded to potential innocent actors. First, the statute at issue usually requires, as it does in this case, a defendant to know, or have reason to know, the item being possessed or controlled is contraband (*i.e.*, drugs or stolen goods including firearms). This requirement immediately eliminates the largest class of innocent actors, those who are unaware they possess or are facilitating the transmission of contraband. Without some proof of knowledge, it is unlikely the criminal charges would get to trial let alone to the jury.

Second, within the doctrine of constructive possession itself, are threshold requirements to be met before a constructive possession charge may be given. A

that point has been reached.

Al-Rekabi objected to the giving of a constructive possession instruction but (having lost that battle) approved the instruction finally proposed (and given) by the trial judge. Ignoring his failure to object, the instructional errors could not have redounded against Al-Rekabi. Because of the trial court's concern that exercised fraternal influence might not be sufficient for constructive possession, the government's burden was increased. The instructional error was harmless to Al-Rekabi for that reason and because the evidence of at least constructive possession is overwhelming. Had the jury accepted Al-Rekabi's version of events (Whitfield took the pistol) it would have been required to acquit under the instructions. Because it did not acquit, the jury could only have concluded Al-Rekabi actually or constructively possessed the pistol; the evidence admits no other possibility. Every version of events except Al-Rekabi's has him either handling the pistol or directing its disposition. Thus, Al-Rekabi could avoid

"sufficient nexus between the accused and the [contraband]" is required. *United States v. Culpepper*, 834 F.2d 879, 882 (10th Cir. 1987). Tenuous connections or unsubstantiated relationships will not support the giving of a constructive possession charge to a jury. Additionally, and relevant to the district court's possible concerns, constructive possession requires the defendant (1) to know that he has the power to exercise dominion or control of the illegal item, *United States v. Cardenas*, 864 F.2d 1528, 1533 (10th Cir. 1989); *United States v. Medina-Ramos*, 834 F.2d 874, 876 (10th Cir. 1987), and (2) such power must be "appreciable." *Verners*, 53 F.3d at 294. This requires something more than a mere correlation between one person's request and another's compliance. Some objective evidence of an appreciable or demonstrable ability to control the acts of another is necessary. Included among the possibilities might be coercion or a financial, contractual, familial or other relationship.

conviction only if his possession was somehow justified.

**B. Justification Instructions**

Claiming the evidence at most showed he only possessed the pistol briefly and for the sole purpose of taking it from his twelve year old brother, Al-Rekabi contends the trial court erred by refusing to instruct on his proposed necessity and fleeting (transitory) possession defenses. The district court concluded the evidence did not support either defense.

"'A criminal defendant is entitled to an instruction on his theory of defense provided that theory is supported by some evidence and the law.'" *United States v. Alcorn,* 329 F.3d 759, 767 (10th Cir. 2003) (quoting *United States v. Haney,* 318 F.3d 1161, 1163 (10th Cir. 2003) (en banc)). "A defendant is not entitled to an instruction which lacks a reasonable legal and factual basis." *United States v. Turner*, 44 F.3d 900, 901 (10th Cir. 1995) (internal quotation omitted). "For the purposes of determining the sufficiency of the evidence to raise the jury issue, the testimony most favorable to the defendant should be accepted." *United States v. Scull*, 321 F.3d 1270, 1275 (10th Cir. 2003) (internal quotation omitted). We review de novo whether the jury instructions given were adequate, but review for an abuse of discretion the denial of defense instructions for necessity and fleeting possession. *See United States v. Meraz-Valeta*, 26 F.3d 992, 995 (10th Cir. 1994), *overruled on other grounds by United States v. Aguirre-Tello*, 353 F.3d 1199, 1208 (10th Cir. 2004); *United States v. Williams*, 403 F.3d 1188, 1195 n.7

(10th Cir. 2005).

*1. Necessity Defense*:

The necessity defense is a narrow exception to stringent federal firearms laws. *See United States v. Adkins*, 196 F.3d 1112, 1115 (10th Cir. 1999) ("[The] federal firearms laws impose something approaching absolute liability.") (internal quotation omitted). "The necessity defense may excuse an otherwise unlawful act if the defendant shows that '(1) there is no legal alternative to violating the law, (2) the harm to be prevented is imminent, and (3) a direct, causal relationship is reasonably anticipated to exist between defendant's action and the avoidance of harm.'" *United States v. Unser*, 165 F.3d 755, 764 (10th Cir. 1999) (quoting *Meraz-Valeta,* 26 F.3d at 995). The defense "'does not arise from a 'choice' of several courses of action . . . . It can be asserted only by a defendant who was confronted with . . . a crisis which did not permit a selection from among several solutions, some of which did not involve criminal acts.'" *Turner*, 44 F.3d at 902 (quoting *United States v. Seward,* 687 F.2d 1270, 1276 (10th Cir. 1982)). S*ee generally United States v. Vigil*, 743 F.2d 751, 756 (10th Cir. 1984) (to raise necessity defense, defendant must establish he faced "an unlawful and present, imminent, and impending [threat] of such a nature as to induce a well-grounded apprehension of death or serious bodily injury") (internal quotations omitted); *United States v. Lewis*, 628 F.2d 1276, 1279 (10th Cir. 1980) (defense of necessity is "based on a real emergency" and "may be asserted only by a

-12-

defendant who was confronted with a crisis as a personal danger"). The necessity

exception should be strictly and parsimoniously applied.[7]

Al-Rekabi must prove his claimed defenses by a preponderance of the

evidence. The government is not required to disprove them. *Dixon*, 126 U.S. at

2442-43.[8] To qualify for an instruction on an affirmative defense such as

---

[7] The availability of a necessity defense was called into question in *United States v. Oakland Cannabis Buyers' Co-op.*:

> As an initial matter, we note that it is an open question whether federal courts ever have authority to recognize a necessity defense not provided by statute. A necessity defense traditionally covered the situation where physical forces beyond the actor's control rendered illegal conduct the lesser of two evils. Even at common law, the defense of necessity was somewhat controversial. And under our constitutional system, in which federal crimes are defined by statute rather than by common law, it is especially so. As we have stated: "Whether, as a policy matter, an exemption should be created is a question for legislative judgment, not judicial inference." Nonetheless, we recognize that this Court has discussed the possibility of a necessity defense without altogether rejecting it.

532 U.S. 483, 490 (2001) (quoting *United States v. Rutherford,* 442 U.S. 544, 559 (1979)). The Supreme Court recently assumed, without deciding, a common law defense of necessity is available. *Dixon v. United States,* 126 U.S. 2437, 2445 (2006). So have we. *United States v. Patton*, __ F.3d __, 2006 WL 1681336 at *19 (10th Cir. June 20, 2006).

[8] In *Dixon* the court said:
Congress can, if it chooses, enact a duress defense that places the burden on the Government to disprove duress beyond a reasonable doubt. In light of Congress' silence on the issue, however, it is up to the federal courts to effectuate the affirmative defense of duress as Congress "may have contemplated" it in an offense-specific context. In the context of the firearms offenses at issue-as will usually be the case, given the long-established common-law rule-we presume that Congress intended the petitioner to bear the burden of proving the

necessity a defendant must produce evidence of each element sufficient to warrant its consideration by the jury. *Bailey*, 444 U.S. at 415 ("[B]ecause a defendant is entitled to have the credibility of his testimony, or that of witnesses called on his behalf, judged by the jury, it is essential that the testimony given or proffered meet a minimum standard as to each element of the defense so that, if a jury finds it to be true, it would support an affirmative defense — here that of duress or necessity."). We respect the trial judge's role as gatekeeper, reviewing such decisions for an abuse of discretion. *Meraz-Valeta*, 26 F.3d at 995; *Williams*, 403 F.3d at 1195 n.7.

---

defense of duress by a preponderance of the evidence. 126 S.Ct. 2437, 2447-48 (quoting *Oakland Cannabis Buyers' Coop.*, 532 U.S. at 491, n.3).

*Dixon* dealt with a duress defense, but duress and necessity are two sides of the same coin. As Chief Justice Rehnquist writing for the Court in *Bailey*, put it:

> While the defense of duress covered the situation where the coercion had its source in the actions of other human beings, the defense of necessity, or choice of evils, traditionally covered the situation where physical forces beyond the actor's control rendered illegal conduct the lesser of two evils. Thus, where A destroyed a dike because B threatened to kill him if he did not, A would argue that he acted under duress, whereas if A destroyed the dike in order to protect more valuable property from flooding, A could claim a defense of necessity.

444 U.S. 394, 409-10 (1980) (citing W. LaFave & A. Scott, Handbook on Criminal Law § 28, pp. 374-384 (1972)). Thus, "[t]he duress defense, like the defense of necessity . . . may excuse conduct that would otherwise be punishable, but the existence of duress normally does not controvert any of the elements of the offense itself." *Dixon*, 126 S.Ct. at 2441 (citing *Bailey*, 444 U.S. at 409-10). A defense such as insanity, which controverts an element of the offense itself, requires the government to disprove the defense beyond a reasonable doubt.

The trial judge refused the necessity instruction. "I think the cases are to the point that there's an imminent threat, and there had to be no other reasonable alternative courses of action. From what I've heard, he could have turned the boy around, marched him back, et cetera." (R. Supp. Vol. I. at 3.) Even under a less deferential standard we would agree with the trial judge. While we view the evidence favorably to Al-Rekabi, we also recognize his burden of proof on the defense and his corresponding obligation to produce evidence on each element of that defense. He failed to do so.

First and foremost, Al-Rekabi must show he had no reasonable legal alternative to possession of the pistol, whether that possession is actual or constructive. *Seward*, 687 F.2d at 1276. The point of this requirement is to force an actor to evaluate the various options presented and choose the best one. In most cases, there will be a clear legal alternative. The government presents two such alternatives: 1) marching Hussein back to the owner of the pistol to return it, or 2) ordering Hussein to put the pistol on the ground and having Whitfield watch it while Al-Rekabi reported the pistol to the police. We agree that at least one of these alternatives would have been reasonable. The trial judge specifically mentioned one — marching Hussein back with the pistol. Her observation underscores critical components of the necessity defense. First, all reasonable alternatives must be foreclosed. Second, if there is no clear legal alternative, an individual would be permitted to violate the law, but only in a very limited way.

-15-

Thus, for example, the necessity defense might allow an individual to take possession, actual or constructive, of stolen goods, but only for the period of time necessary to return them to their owner or turn them into the police.

Although some leeway needs be given to individuals responding to an emergency, they must still act in the most responsible manner available under the circumstances. Not only did Al-Rekabi fail to exhaust legal alternatives, the necessity he claims would not permit his cavalier response. In no version of the events did he report the stolen pistol to the police,[9] return it to the true owner, or attempt to leave it in a safe place where it could be found by the police, who were actively looking for it. Some attempt to place a stolen pistol into the hands of the police is an irreducible minimum in evaluating Al-Rekabi's necessity defense, especially since it appears his possession (actual or constructive) and hence his crime was continuing.[10] By keeping or stashing the pistol, or by directing another to do so, Al-Rekabi continued to perpetuate the underlying crime — depriving the true owner of possession and maintaining control of it in violation of 18 U.S.C. § 922(j) — making the necessity defense unavailable. The justification of

_____

[9] Al-Rekabi reported the incident to his probation officer, but more than forty-eight hours after the fact. *See* note 2, *supra*.

[10] In every version of events except the one rejected by the jury (Whitfield did it), Al-Rekabi either had the pistol or controlled its destiny. Moreover, his control was demonstrated by his ability to quickly have the pistol produced for the police when requested to do so. His actual or constructive possession continued until the pistol was finally placed in the hands of the police.

necessity lasts only as long as the circumstances giving rise to it.  That is the potent lesson of *Bailey*.  444 U.S. at 415.

*Bailey* critically informs any discussion of the necessity defense.  There, inmates escaped from the District of Columbia jail.  In their escape trial, the inmates claimed dangerous prison conditions prompted and necessitated their escape.  The district court refused their evidence of poor prison conditions and refused to instruct the jury on necessity, foreclosing the claimed defense.  It did so because in the one to three and one-half months they were on the lam the inmates made no credible attempt to surrender to authorities.  The Supreme Court upheld the district court, saying:

> We therefore hold that, where a criminal defendant is charged with escape and claims that he is entitled to an instruction on the theory of duress or necessity, he must proffer evidence of a bona fide effort to surrender or return to custody as soon as the claimed duress or necessity had lost its coercive force.  We have reviewed the evidence examined elaborately in the majority and dissenting opinions below, and find the case not even close, even under respondents' versions of the facts, as to whether they either surrendered or offered to surrender at their earliest possible opportunity.  Since we have determined that this is an indispensable element of the defense of duress or necessity, respondents were not entitled to any instruction on such a theory.

*Bailey*, 444 U.S. at 415.

*Bailey is* congruent with this case and its reasoning is compelling.  In the case against Bailey and the other escapees, the government was required "to prove (1) that they had been in the custody of the Attorney General, (2) as the

-17-

result of a conviction, and (3) that they had escaped from that custody." *Id.* at 407. Here the government had to prove (1) Al-Rekabi knowingly possessed the pistol, (2) the pistol was stolen when he possessed it, and (3) he knew or had reasonable cause to believe it was stolen. 18 U.S.C. § 922(j). Both escape and possession of a stolen firearm are general intent crimes. Escape is a continuing offense. *Bailey*, 444 U.S. at 413. A violation of § 922(j) continues so long as the defendant knowingly possesses (actually or constructively) a firearm he knows to be stolen. Given the similarity of the elements of the crimes here and in *Bailey*, the defense of necessity should be measured by the same yardstick. For his necessity defense to fly, Al-Rekabi should have caused the pistol to be turned over to the police promptly after he divested his brother of it. At the very minimum he must have demonstrated a good faith attempt to do so. He made no such showing. It is, again, much like *Bailey* where the trial court consistently stressed "that, to sustain their defenses, respondents would have to introduce some evidence that they attempted to surrender or engaged in equivalent conduct once they had freed themselves from the conditions they described. But the court waited for such evidence in vain." *Id.* at 399.

A claim of necessity may be little more than an *ex-post* attempt by defense counsel to exculpate a client. Such a claim is easily made and so must be factually justified. "Vague and necessarily self-serving statements of defendants or witnesses as to future good intentions or ambiguous conduct simply do not support

-18-

a finding of this element of the defense." *Id*. at 415. Demanding a prompt and appropriate remedial response to the claimed "necessity" is a legitimate precondition to recognizing the defense and is also a useful tool in measuring the bona fides of a claimant. The evidence does not suggest the lack of a reasonable legal alternative. If it had, Al-Rekabi's response was not measured and reasonable as the necessity defense requires. The district judge properly exercised her gate-keeping responsibilities. The first part of the necessity test was not met. Neither was the second.

The defendant must show an imminent danger — a real risk of death or serious bodily injury. A twelve year-old boy possessing a loaded pistol is potentially very dangerous, but the danger in this case was not clearly "imminent." Hussein had already stolen the weapon, transported it to an abandoned house, hid it in a heater vent, later retrieved it and was carrying it in his waistband at the time he was accosted by Al-Rekabi.[11] There is no evidence Hussein was handling the weapon in a reckless manner by pointing it at someone or attempting to discharge it. The trial judge remarked: "There's no evidence such as that he had it cocked to his head, that he was not able to understand the English language, et cetera." (R. Supp. Vol. I at 4.) The evidence did not even establish the pistol was loaded.[12]

---

[11] Hussein was no stranger to guns.

[12]"The court: The gun was not loaded; right?
Ms. Angelos [Al-Rekabi's attorney]: But there was a readily accessible clip that he could have stuck in --

-19-

That is not necessarily telling because Al-Rekabi was justified in considering it to be loaded. But his account of his response to the claimed emergency is telling. Upon discovering Hussein with the pistol he immediately started slapping and kicking his brother (who still had the pistol). He made no attempt to disarm Hussein (who, apparently, had the pistol and the two magazines in his waist band), to determine whether the pistol was loaded or to make the pistol safe by removing any magazine from it. His acts are simply not consistent with an imminent threat.[13] He stashed the pistol or had others do so.[14] That brings us to the final factor.

Even assuming Al-Rekabi presented sufficient evidence to establish he had no reasonable legal alternative to possessing the pistol and the danger was imminent, he failed to establish his actions were reasonably calculated to prevent the harm posed by the circumstances. Here again, Al-Rekabi's failure to report or return the pistol haunts him. Among other problems with Al-Rekabi's response to the crisis, the failure to report the pistol to the police undermines Al-Rekabi's

The Court: Right. But it's not like all he has to do is pull the trigger?
Mr. Kouris [Al-Rekabi's attorney]: I think it may have been one that all he had to do is cock and the --
The Court: We haven't heard that. I haven't heard that from --
Mr. Kouris: Well, we could still bring that out if that's the case.
The Court: Well, I think in that case that I still don't think its justification."
(R. Supp. Vol. I at 4.)

[13] Nor were they "reasonably anticipated" to avoid the harm presented by the child.

[14] Again, for this purpose we discount Al-Rakabi's version (Whitfield did it) because the jury did not credit his testimony.

claim that he was simply acting in his brother's best interest or the public's. Of course, the nature of the appropriate corrective action will depend on the nature of the underlying offense. In our view, someone who takes it upon himself to knowingly possess a stolen weapon in violation of § 922(j), even if justified by the circumstances, is required to render it safe and turn the it over to the police or, if a convicted felon, report the incident to his parole officer. In any event he is required to act promptly. Removing the handgun from his brother and then either keeping it or turning it over to Whitfield were not actions reasonably calculated to prevent the anticipated harm. *See United States v. Mason*, 233 F.3d 619, 624-25 (D.C. Cir. 2001) (defense instruction warranted when a delivery man, who was a convicted felon, picked up a handgun left near a school *in order to turn it over to a police officer* he encountered on his regular route).

Because Al-Rekabi presented no such evidence, opportunity's door did not open. If events actually transpired as Al-Rekabi described them and he had given up his control over the pistol by securing it and alerting the police, it is unlikely he would even have been charged. His post hoc claims of innocent possession are unavailing in light of his conduct

*2. Fleeting Possession*

As for Al-Rekabi's other asserted defense, we have discussed but never

-21-

applied a fleeting possession defense.[15] This is largely because it is redundant to

the necessity defense.[16] Both defenses, as we have said, require the defendant to

prove no reasonable legal alternative was available to him given the

circumstances.[17] It is true that we have acknowledged the possibility of a fleeting

possession defense on two occasions. *See Adkins*, 196 F.3d at 1115; *Williams*, 403

F.3d at 1196. In neither case was it adopted. In both cases the discussion of

fleeting possession served merely to emphasize that a defendant's justification for

---

[15] Some courts also refer to the "fleeting possession" defense as the "transitory possession" defense. *See United States v. Montgomery*, 444 F.3d 1023, 1026 (8th Cir. 2006) (summarily rejecting the application of the defense in the case at bar).

[16] As expressed in *Adkins*, the elements of the fleeting possession defense are met when the defendant establishes he (1) "merely momentarily possessed [the] contraband," and (2) "either lacked knowledge that he possessed contraband or had a legally justifiable reason to possess it temporally." 196 F.3d at 1115. We point out that if a defendant "lacks knowledge that he possessed contraband" he will be deemed not to have possessed the contraband in the first place and should not need the protection of a specially carved-out defense. *See Ledford*, 443 F.3d at 713-17 (requiring possession of a firearm to be "knowingly").

[17] While there may be some theoretical gap between the language of the two tests, *i.e.*, "legally justifiable reason" in *Adkins*, 196 F.3d at 1115, versus "no legal alternative to violating the law" in *Unser*, 165 F.3d at 764, the necessity defense as applied in *Bailey* removes any difference. As the Supreme Court put it in *Bailey*, a necessity defense is available where the defendant demonstrates that "given the imminence of the threat, violation of [the law] was his only reasonable alternative." 444 U.S. at 411. Thus, as construed, "legally justifiable reason," is the equivalent to "no legal alternative to violating the law." In other words, "no legal alternative" does not literally mean the defendant had "no legal alternative," but rather that he "was confronted with . . . a crisis which did not permit a selection from among several solutions, some of which did not involve criminal acts." *Turner*, 44 F.3d at 902 (internal quotation omitted).

violating the law lasts only as long as the circumstances giving rise to it. Consider *United States v. Panter*, 688 F.2d 268 (5th Cir. 1982), one of the principle cases relied upon by *Adkins*. 196 F.3d at 115. There, the Fifth Circuit held the defendant, a former felon, who reached under a bar to grab a handgun to fend off a convicted murderer who was assailing him by stabbing him in the abdomen was justified in doing so. 688 F.3d at 269, 272. Based on our precedent, such conduct, if adequately established, would clearly fall under the necessity defense, as it did in *Panter* itself. 688 F.3d at 272 n.7 (discussing the differences between a "self-defense" and "necessity" justification and concluding defendant met both). *Panter*'s discussion of the temporary nature of the defendant's otherwise illegal possession of the firearm was tied to the necessity defense. The court pointed out that "our holding protects a . . . defendant only for possession during the time he is endangered. Possession either before the danger or for any significant period after it remains a violation." *Id*. at 272. We find *Panter*'s discussion of the temporary nature of the *necessity defense* in accord with our own view. Thus, failing to establish a necessity defense, Al-Rekabi is out of justifications.

**II. Exclusion of Evidence**:

Al-Rekabi sought to impeach Whitfield's trial testimony by introducing evidence of Whitfield's conviction for criminal mischief under Utah Code Ann. § 76-6-106. The conviction could be characterized as a "misdemeanor crime of domestic violence" under 18 U.S.C. § 922(g)(9), and thus, Whitfield could not

-23-

legally possess a firearm.[18] Al-Rekabi argues Whitfield's prior conviction gives him a motive to lie and testify he never took possession of the pistol. Because the state offense was not a misdemeanor crime of domestic violence under § 922(g)(9) the trial court refused the evidence. The district court's decision to exclude evidence is reviewed for an abuse of discretion. *United States v. Howell*, 285 F.3d 1263, 1267 (10th Cir. 2002).

The phrase "misdemeanor crime of domestic violence" in § 922(g)(9) is defined as a misdemeanor under state or federal law that "has, as an element, the use or attempted use of physical force, or the threatened use of a deadly weapon, committed by a current or former spouse, parent, or guardian of the victim, by a person with whom the victim shares a child in common, by a person who is cohabiting with or has cohabited with the victim as a spouse, parent, or guardian, or by a person similarly situated to a spouse, parent, or guardian of the victim." 18 U.S.C. § 921(a)(33)(A)(ii). *See United States v. Heckenliable*, 446 F.3d 1048, 1049 (10th Cir. 2006); *United States v. Rogers*, 371 F.3d 1225, 1229 (10th Cir.

_____

[18] Section 922(g) of Title 18, United States Code, provides in pertinent part:

(g) It shall be unlawful for any person --
(9) who has been convicted in any court of a misdemeanor crime of domestic violence, to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.

18 U.S.C.A. § 922(g)(9).

2004) ("922(g)[(9)] . . . seek[s] to protect society in general, and the intimate partners of persons with a background of domestic violence in particular, by reducing the risk of violence that may result from the possession of guns by persons with a proven propensity for violence."). "[T]he use or attempted use of physical force" or "the threatened use of a deadly weapon" is not an element of criminal mischief under Utah Code Ann. § 76-6-106.[19] In fact, § 76-6-106 is primarily concerned with property crimes, not crimes involving the use, attempted use or threatened use of physical force or a deadly weapon against a victim.) Utah Code Ann. § 76-6-106 is not a "misdemeanor crime of domestic violence" under § 922(g)(9). The trial court did not err.

## Conclusion

For the foregoing reasons, the judgment of the district court is AFFIRMED.

---

[19] The statute provides:

A person commits criminal mischief if the person:
(a) under circumstances not amounting to arson, damages or destroys property with the intention of defrauding an insurer; (b) intentionally and unlawfully tampers with the property of another and as a result: (I) recklessly endangers: (A) human life; or (B) human health or safety; or (ii) recklessly causes or threatens a substantial interruption or impairment of any critical infrastructure; (c) intentionally damages, defaces, or destroys the property of another; or (d) recklessly or willfully shoots or propels a missile or other object at or against a [vehicle], whether moving or standing.

Utah Code Ann. § 76-6-106(2)(a)-(d). Contrary to Al-Rekabi's assertion the district court did not exclude the evidence based on the absence of an element in § 76-6-106 requiring a domestic relationship. Such a requirement would have been error. *See Heckenliable*, 446 F.3d at 1049.