**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**May 24, 2007**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

      Plaintiff-Appellee,

v.

CASSANDRA BENALLY,

      Defendant-Appellant.

No. 06-2277
(D.C. No. CR 06-756 MV)
(D. N.M.)

---

**ORDER AND JUDGMENT**[*]

---

Before **BRISCOE, HOLLOWAY,** and **MURPHY**, Circuit Judges.

---

    This case involves Defendant Cassandra Benally's (Benally) attempt to secure a

necessity-defense instruction in her trial on a charge of possession of a firearm by her and

co-defendant Kelly on high-school grounds, which they knew and had reasonable cause

to believe was a school zone. Benally's appeal raises one issue: whether the trial judge

erred by refusing to instruct the jury with regard to Benally's defense of necessity on

Count 1, the firearm-possession charge. She was acquitted on Count 2, which charged

Benally and Defendant Kelly with discharging the firearm, a 20 gauge shotgun, in a

school zone. We conclude that the trial judge did not abuse her discretion in refusing to

---

[*]This order and judgment is not binding precedent except under the doctrines of
law of the case, res judicata and collateral estoppel. It may be cited, however, for its
persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

give the requested necessity-defense instruction, and we affirm Benally's conviction.

## I. BACKGROUND

### A. Facts

On December 15, 2005, Benally lived in Shiprock, New Mexico, with her grandmother, mother, sister, and brother. Trial Tr. at 30. Sometime during the early afternoon, Jay Ray Kelly (Kelly), the sisters' mutual friend, went to this family residence. Id. at 32-33. When Kelly arrived, Benally greeted him outside and at some point began telling him about her uncle's shotgun. Id. at 33-34, 319-20. Before long, Benally came back in the house with an idea first suggested by Kelly: to shoot inanimate targets with her uncle's shotgun, which he stored in the residence. Id. at 34, 69, 305. Benally's sister did not object, so either Benally or her sister retrieved the shotgun from a room in the residence, and Benally put the gun in Kelly's car. Id. at 34, 321, 355-56, 375. Benally's sister brought the ammunition, about seven shotgun shells, and they all piled into Kelly's car. Id. at 35, 356. They were off to shoot bottles at a rural gravel pit. Id. at 35, 70.

The three of them went to a remote area and took turns firing the shotgun. Id. at 357. They each handled and fired the gun. Id. at 36, 357. After exhausting their ammunition, they returned to Benally's grandmother's house. Id. at 72. But they decided that they hadn't had enough. Id. at 36-37, 72. So they went to the residence once again and located Benally's uncle's shotgun shells, planning to use them to shoot more targets at their grandmother's farm. Id. at 37, 358. Before their target practice continued, however, Kelly informed the sisters that he needed to pick up his sister from the local

-2-

high school, and the sisters agreed to go with him.  Id. at 37-38, 41, 308, 326.  Benally put the gun on the front passenger side of Kelly's vehicle, in which she was the front passenger and Kelly was the driver.  Id. at 38, 39, 40, 308-09.

Kelly then drove to the high school with Benally seated next to the firearm and with Benally's sister in the backseat.  Id. at 41, 42.  Benally admitted on cross-examination that she had "ready access" to the firearm when they entered the school grounds; she stated that she put the gun in the car before entering the school zone and that she could have grabbed the gun at any time.  Id. at 379-80.  Indeed, Benally believed that she possessed the firearm when she entered the school zone and testified that no one was allowed to take the shotgun from the car seat without her permission.  Id. at 382.  Kelly testified similarly: he would not have driven to the school with the gun in the car if Benally or her sister instructed him not to do so.  Id. at 328.

After they arrived on school grounds, Kelly parked his car.  Id. at 43.  The gun still rested between Kelly and Benally.  Id. at 380.  But because they could not see Kelly's sister, Kelly and Benally exited the car and walked in and around the school looking for Kelly's sister, leaving behind Benally's sister and the gun.  Id. at 43-44, 309.

Kelly and Benally returned with Kelly's sister.  Id. at 44, 237, 310.  They all got back into the vehicle where the shotgun still rested, but Kelly's sister exited the car and walked toward the school to speak with her friends.  Id. at 46, 237, 310, 330.  At this point, the alleged necessity-creating event had already been set in motion: Kelly's presence and gesturing on the school grounds had provoked Cordell Washburn.  Id. at 47,

-3-

362. Soon after Benally and Kelly returned to Kelly's car, Washburn pulled his car next to Kelly's. Id. at 46-47. He emerged from his car with an aluminum baseball bat, both cussing at Kelly and acting as if he was going to smash Kelly's windows with the bat. Id. at 47, 48, 78. It appeared that a fight was about to occur. Id. at 79, 364.

At that point, Kelly grabbed the shotgun around the barrel. Id. at 94. Why Kelly grabbed the gun is a matter of debate. Benally told the police that Kelly grabbed the gun because he was drunk and he wanted to show off the shotgun to the bat-wielding student. Id. at 240. She further explained at trial that she heard Kelly say something about loading or unloading the gun before he grabbed it, but that Kelly cocked back the gun's hammer instead. Id. at 366. According to Benally, this triggered her to grab the gun from Kelly because she thought that introducing a gun into an already escalating situation would prove deadly. Id. at 366-67.

Kelly testified that he grabbed the gun because he thought that a fight might ensue and he did not want the police to catch him with a firearm on school property. Id. at 332. Thus, he claimed that he grabbed the gun to help Benally unload it and stow it away. Id. at 332, 336.

Despite their alleged motives, Kelly and Benally briefly struggled to control the weapon, and it discharged bird shot into Kelly's wrist when he pulled the gun toward him. Id. at 48, 95, 336. The commotion created by Kelly and Washburn's altercation alerted a passerby, who then alerted the school's security. Id. at 106. A school security guard arrived at the scene immediately after Kelly was shot. Id. at 108. The guard found

the gun and ammunition in the front passenger seat and turned this evidence over to the police. Id. at 111-13.

## B. The Trial and Benally's Requested Instruction

The Government charged Benally and Kelly with possessing a firearm in a school zone (Count I), in violation of 18 U.S.C. § 922(q)(2)(A), 18 U.S.C. § 924(a)(2), and 18 U.S.C. § 2 (aiding and abetting), and knowingly or recklessly discharging a firearm in a school zone (Count II), in violation of 18 U.S.C. § 922(q)(3)(A), 18 U.S.C. § 924 (a)(4), and 18 U.S.C. § 2. R., Vol. I, Doc. 1. Kelly pleaded guilty to possessing a firearm in a school zone in exchange for the Government's promise to drop the second count of the indictment. Benally took her chances and went to trial.

At the close of the evidence, Benally submitted a proposed jury instruction on her necessity defense:

> Ms. Benally has asserted the affirmative defense that she is not guilty because if she knowingly possessed or discharged a firearm on school grounds, she did so out of necessity. You may not find Ms. Benally guilty of that portion of the allegations contained in Count 1 that concern the point in time Mr. Washburn approached Mr. Kelly's vehicle with a bat to the point in time Mr. Kelly was shot or Count 2 if you find and agree that the defense proved by a preponderance of the evidence the following elements:
>> First, that there was no legal alternative to violating the law;
>> Second, that the harm to be prevented was imminent; and
>> Third, that a direct, casual relationship existed between Ms.
> Benally's action and the avoidance of harm.

R., Vol. I, Doc. 59.

According to Benally, this language instructs the jury that it may not convict her of

possessing a firearm in a school zone if (1) Benally possessed the gun out of necessity when she grabbed it from Kelly, and (2) the jury found that this was the only time Benally possessed the gun in the school zone. The crux of Benally's argument to the district court was that the evidence supports the finding that Benally did not possess the firearm until she touched it. Trial Tr. at 416, 418-419 (stating that "[s]he is only in proximity [to the gun] . . . [and] didn't really at any time ever attempt to exercise dominion and control . . ."). And since the evidence allegedly supported the finding that when she touched the gun, she then did so out of necessity, Benally concludes that the court should have given the instruction. Id.

The district court gave the necessity-defense instruction as to Count II (discharging a firearm in a school zone), but refused to give the instruction as to Count I (possessing a firearm in a school zone). Id. at 430. The district court reasoned that the evidence did not support giving the instruction as to Count I. Id.

The jury convicted Benally of Count I, but acquitted her of Count II. R., Vol. I, Doc. 63. The district court sentenced Benally to 63 days' imprisonment (time served), 2 years' supervised release, and a $100 special assessment. R., Vol. I, Doc. 72. Benally now appeals the district court's refusal to provide the necessity-defense instruction to the jury. We exercise jurisdiction under 28 U.S.C. § 1291 and **AFFIRM**.

## II. DISCUSSION

### A.

We review for abuse of discretion a district court's refusal to supply an instruction

-6-

for the necessity defense and consider the instructions as a whole de novo to determine whether they accurately apprise the jury of the governing law. United States v. Williams, 403 F.3d 1188, 1195 n.7 (10th Cir. 2005). The district court "has substantial discretion wording the instructions, as long as they adequately present the law and the issues." Id. If the district court erred by refusing to give a proposed instruction, "we must determine whether the conviction must be set aside because the 'error had a substantial influence on the outcome of the trial or leaves us in grave doubt as to its influence on the verdict.' If the error is harmless the conviction will stand." United States v. Al-Rekabi, 454 F.3d 1113, 1119 (10th Cir. 2006).

A defendant is entitled to a theory-of-defense instruction if the defense theory is supported by sufficient evidence for a jury to find in the defendant's favor. United States v. Grissom, 44 F.3d 1507, 1512 (10th Cir. 1995). See generally Al-Rekabi, 454 F.3d at 1122 (stating that "[a defendant] must prove his [or her] claimed defenses by a preponderance of the evidence"). A defendant is not entitled to an instruction, however, if the defense theory lacks a reasonable factual or legal basis. Grissom, 44 F.3d at 1512.

The Government charged Benally with possessing a firearm in a school zone, in violation of 18 U.S.C. § 922(q)(2)(A), 18 U.S.C. § 924(a)(2), and 18 U.S.C. § 2. Section 922(q)(2)(A) required the Government to prove that Benally knowingly possessed a firearm, which had moved in or which otherwise affected interstate or foreign commerce, in an area she knew, or had reasonable cause to believe, was a school zone. The parties do not dispute that the gun moved in interstate commerce and that Benally possessed the

gun in an area she knew to be a school zone. But the parties dispute two critical issues: first, whether Benally possessed the firearm in a school zone outside of the time frame when Kelly's altercation with Washburn allegedly justified Benally's possession; and second, whether Benally justifiably possessed the gun when she grabbed the gun from Kelly. For Benally's appeal to be successful, she must show that the jury had sufficient evidence before it to conclude that she did not possess the weapon in a school zone before the incident with Kelly and that she justifiably grabbed the weapon from Kelly. See Grissom, 44 F.3d at 1512 (stating that "a defendant is not entitled to an instruction which lacks a reasonable factual and legal basis").

To assess the evidence of Benally's possession, we must define what it means to possess a firearm. Benally admitted actually possessing the gun throughout the day, but the parties dispute whether she constructively possessed the weapon when she entered the school zone. While Benally urges us not to address this issue, arguing that whether she possessed the gun is a quintessential jury question, her request misconceives the nature of our inquiry. Benally was entitled to her proposed instruction only if the evidence submitted supported her defense theory. Thus, we ask only one overarching question when considering whether the evidence sufficiently supports a conclusion that Benally did not constructively possess the weapon in a school zone: are there facts to support Benally's request for the instruction?

This Court has carefully explained the contours of the constructive-possession doctrine. In Al-Rekabi, 454 F.3d at 1118, 1120, we stated that "constructive possession

-8-

exists where the defendant knowingly has the power to exercise control or dominion over the item. . . . A knowing ability to control is all constructive possession requires, even in a joint occupancy situation." Although constructive possession may be proved by circumstantial evidence, we explained that we would not uphold a conviction based on constructive possession unless "there is some evidence 'supporting at least a plausible inference that the defendant had knowledge of and access to the weapon . . . .'" Id. at 1118-19. Put otherwise, in a joint occupancy case, there must be some connection or nexus between the defendant and the firearm. United States v. Michel, 446 F.3d 1122, 1128 (10th Cir. 2006).

> The "sufficient-nexus" requirement takes the form of a five-part rule:
>
> (1) proximity alone may not establish knowledge and access in a joint occupancy case, (2) neither may proximity alone support a finding of dominion and control in a joint occupancy case, (3) evidence of knowledge and access gives rise to a permissive inference of dominion and control, (4) evidence of knowledge and access may be proved by direct evidence, or inferred from circumstantial evidence, so long as the circumstantial evidence includes something other than mere proximity, (5) proximity may be considered with other evidence in the case to support an inference of knowledge and access, and dominion and control over the firearm.

United States v. Jameson, 478 F.3d 1204, 1209-10 (10th Cir. 2007).

We have explained the elements of the necessity defense in comparable detail, but we have urged "the parsimonious use of justification instructions" and noted that "[t]he necessity defense is a narrow exception to stringent federal firearm laws." Al-Rekabi, 454 F.3d at 1117, 1121 (citing United States v. Adkins, 196 F.3d 1112, 1115 (10th Cir.

-9-

1999) (observing that the "federal firearms laws impose something approaching absolute liability") (internal quotation omitted)). "The necessity defense may excuse an otherwise unlawful act if the defendant shows that '(1) there is no legal alternative to violating the law, (2) the harm to be prevented is imminent, and (3) a direct, causal relationship is reasonably anticipated to exist between defendant's action and the avoidance of harm.'" Id. at 1121. The defense may be asserted "only by a defendant who was confronted with . . . a crisis which did not permit a selection from among several solutions, some of which did not involve criminal acts." Id.

**B.**

Applying these principles here, Benally's appeal must fail. It is indisputable that Benally constructively possessed the firearm when she entered the school zone. First, Benally had knowledge of and access to the gun when she entered the school zone. She took the gun from her house, used it to shoot inanimate targets, and rode in a vehicle into the school zone with the gun by her side. When she entered the school zone, Benally knew that the weapon was next to her in the vehicle. Indeed, on cross-examination Benally admitted that she had "ready access" to the shotgun; Mr. Kelly drove onto the school ground, and the shotgun was still by her. She admitted that she "could have grabbed it at any time." Trial Tr. at 379.

Second, Benally had the power to exercise dominion and control over the firearm, even if jointly with her sister and Kelly. She repeatedly handled the gun that day and no evidence suggests that her dominion and control over the shotgun were severed before

-10-

she entered the school zone. Again, we note that Benally admitted that she had knowledge of and access to the gun when she entered the school zone, giving rise to an inference of dominion and control. Moreover, Benally admitted she was "responsible for that shotgun." Id. at 381. Benally explained that by "responsible" she understood that she "had possession of it," and conceded that she "had to take care of that shotgun . . . ." Id. at 381. She further admitted that she could grab the shotgun at any time. Moreover, Kelly testified that if Benally or her sister told him that they were not taking the gun to the school, he would have complied with this instruction. Although the question in constructive-possession cases is whether the defendant had the ability to control the weapon, not the right to control, see Al-Rekabi, 454 F.3d at 1120, this testimony further supports the conclusion that she had the ability to exercise dominion and control over the gun.

Finally, Benally's proximity to the gun, combined with her testimony about her other connections to the gun, also supports an inference of knowledge and access and dominion and control. Considering all this evidence, a reasonable jury could conclude only that Benally constructively possessed the shotgun.

Benally's argument that the jury could find to the contrary is not supported by any evidence, but is seemingly derived from Benally's misunderstanding of the constructive-possession doctrine and the evidence presented. See Grissom, 44 F.3d at 1513 (noting a case where the court held that the theory-of-defense instruction was properly refused when it "was essentially a recounting of the facts as seen through the rose-colored glasses

-11-

of the defense . . ."). Specifically, Benally wrongly asserts that the jury could conclude that "her relationship to the firearm was one of mere proximity." Aplt. Reply Br. at 5. As explained above, the evidence does not support this conclusion.

Benally also argues that she did not constructively possess the firearm because she did not exercise dominion and control over it when it rested next to her in Kelly's vehicle. Id. at 4, 6. If by this argument Benally suggests that she did not constructively possess the firearm because she did not actually or physically possess it, see id. at 6 (comparing her later actual possession of the firearm with her being a "mere passenger in Mr. Kelly's car"), her argument plainly contradicts our precedent. See Al-Rekabi, 454 F.3d at 1120. If she means to suggest that she did not otherwise affirmatively exercise dominion and control, whatever that might mean, our precedent requires the Government to prove only that Benally knowingly had the *power* to exercise dominion or control, which may be inferred from her knowledge of and access to the gun. See id. at 1118, 1120 (stating that "constructive possession exists where the defendant knowingly has the *power* to exercise control or dominion over the item. . . . A knowing *ability* to control is all constructive possession requires, even in a joint occupancy situation") (emphasis added); Jameson, 478 F.3d at 1209 (stating that "evidence of knowledge and access gives rise to a permissive inference of dominion and control").

In sum, Benally's testimony and all the evidence in this case points in one direction: while entering the school zone, Benally had knowledge of and access to the firearm, and, based on these facts and her proximity to the gun, she had the power to

exercise dominion and control over the firearm. As Benally recognizes, the necessity defense would not apply to the time she entered the school zone because, *inter alia*, there was then no imminent harm to prevent. Thus, the record supports but one conclusion: Benally constructively possessed the firearm when she entered the school zone—before the alleged necessity arose.

## C.

Defendant Benally's proposed instruction would temporally split the events in dispute. According to Benally, the jury could have found that she did not possess the weapon in a school zone until she grabbed it from Kelly—an action the jury might have concluded was performed out of necessity. Since no instruction informed the jury that it could acquit Benally under this scenario, and since she concludes that a jury so instructed might have done so here, Benally asserts that the district court committed reversible error.

The fundamental problem for Benally arises with her major premise, that a jury could have found that she did not constructively possess the weapon in a school zone. As explained, no evidence supports this conclusion. To be sure, this would be a closer case if Benally presented sufficient evidence for a jury to conclude that she did not constructively possess the firearm. In this case, however, the jury's only analytical route to Benally's ultimate conclusion that the necessity defense applied would have been ignoring the undisputed evidence or the constructive-possession instruction. The district court did not abuse its discretion by avoiding this result, as a reasonable jury could conclude only that Benally committed the crime charged before the alleged necessity-

-13-

creating event transpired. In light of these facts, the instructions as given accurately conveyed the governing law.

We find no error in the trial judge's refusal to give the necessity-defense instruction. We therefore **AFFIRM** the conviction.

Entered for the Court,


William J. Holloway, Jr.
Circuit Judge