**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**February 19, 2009**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

    Plaintiff-Appellee,

v.

JAMES CAPADONA,

    Defendant-Appellant.

No. 08-1156
(D.Ct. No. 1:98-CR-00432-EWN-1)
(D. Colo.)

_____

**ORDER AND JUDGMENT**[*]

Before **BARRETT, ANDERSON**, and **BRORBY**, Circuit Judges.

_____


After examining the briefs and appellate record, this panel has determined

unanimously that oral argument would not materially assist in the determination

of this appeal. *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is

therefore ordered submitted without oral argument.


Defendant James Capadona was convicted by a jury of escape from federal

custody, in violation of 18 U.S.C. § 751(a), and sentenced to thirty months

_____

[*] This order and judgment is not binding precedent except under the
doctrines of law of the case, *res judicata* and collateral estoppel. It may be cited,
however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th
Cir. R. 32.1.

imprisonment and three years supervised release. He now appeals both his conviction and sentence on grounds the district court erred: (1) by declining to rule on the sufficiency of his affirmative defense of justification prior to trial, thereby depriving him of the opportunity to make a reasoned choice whether to testify or remain silent at trial; and (2) in applying a two-point enhancement for obstruction of justice based on its finding Mr. Capadona perjured himself at trial. We exercise jurisdiction pursuant to 18 U.S.C. § 3742(a) and 28 U.S.C. § 1291 and affirm Mr. Capadona's conviction and sentence.

## I. Factual and Procedural Background

On August 19, 1998, Mr. Capadona walked away from a minimum security prison camp located at the Florence, Colorado, Federal Correctional Complex (FCC) after serving approximately one-half of his ninety-seven-month sentence for a drug-related offense. He remained a fugitive for more than six and one-half years, from August 1998 until his arrest in San Francisco, California, in March 2005. He was indicted on one count of escape, in violation of 18 U.S.C. § 751(a), and extradited to Colorado to face federal prosecution on the pending charge.

Prior to trial, Mr. Capadona gave notice of his intent to assert the affirmative defense of "necessity or duress," pursuant to *United States v. Bailey*, 444 U.S. 394 (1980), which the parties now refer to as a "justification defense,"

as termed in *United States v. Butler*, 485 F.3d 569, 572 n.1 (10th Cir. 2007). Relying on *Bailey*, Mr. Capadona advised he would prove the four elements of such a defense by showing: (1) his life was in imminent danger from: (a) a member of the prison staff who had threatened him, and (b) a group of prison guards, referred to as the "Cowboys," who violently treated inmates; (2) it would have been futile to raise an outcry; (3) no person was harmed in the course of his escape; and (4) he had not reached a position of safety during the six and one-half years following his escape because he believed he would inevitably face retribution from prison officials if he returned to custody. While Mr. Capadona stated he recognized that *Bailey* requires a threshold showing for each of these elements before a justification defense can properly be submitted to a jury, he urged the court not to "act as a super-gate keeper" in making a pre-trial determination as to whether his evidence would be sufficient for jury consideration and, instead, to let the jury make the determination.

The government filed a response in opposition and moved in limine to preclude Mr. Capadona's introduction of evidence in support of the justification defense at trial, challenging the prima facie threshold sufficiency of such evidence to meet all the required elements of that defense. Also relying on *Bailey*, it asserted Mr. Capadona could not prevail as a matter of law on the fourth element regarding not being able to reach a position of safety for almost seven

-3-

years after his escape, given the Supreme Court's determination that three months as a fugitive was too long as a matter of law to succeed on the fourth element. *See Bailey*, 444 U.S. at 399, 415. Mr. Capadona replied, arguing the decision on the viability of his asserted justification defense should be left to the jury, and not the court, and that a determination on the sufficiency of his proffer prior to trial, including his own testimony, would deprive him of his right to present a "complete defense" at trial.

At a status conference, the parties again presented argument on the issue of the justification defense, and Mr. Capadona's counsel reiterated the defense's position that it would produce sufficient evidence to support the affirmative defense, which should be an issue for jury determination. He also acknowledged that proving the fourth element of achieving a position of safety could be a problem but urged that "if we can't produce a scintilla of evidence that [Mr. Capadona] was not in a position of safety, then I can understand the court not going with the jury instruction to the effect of he was under duress." R., Vol. 3 at 4-5. Counsel also pointed out a trial would be needed anyway, given Mr. Capadona's unwavering position that he would not plead guilty to the charge.

Thereafter, the district court issued an order denying the government's motion in limine to preclude the admission of the justification defense evidence at

trial. While the district court acknowledged its authority to determine whether Mr. Capadona met the minimum standard of proof on each element, it made no determination on the sufficiency of his evidence supporting his affirmative defense at that time and announced its intent not to hold a pretrial evidentiary hearing, stating:

> Such a hearing could only lead to one of two results: the defense is either available or unavailable. If it is the former, the parties will be forced to re-argue the evidence before the jury and the court will have wasted scarce judicial resources in conducting duplicative proceedings. If the latter, the court will have wasted resources in an unnecessary proceeding on the eve of trial. Accordingly, [Mr. Capadona] may present his evidence concerning his affirmative defense at trial. This court will serve in its proper capacity as gatekeeper, and will only allow the jury to consider the defense if [he] has adequate evidence to support the elements thereof.

R., Vol. 1, Doc. 62 at 5-6.

At the pretrial motions hearing, the district court addressed the justification defense issue again, questioning the sufficiency of Mr. Capadona's proof and his need to lay a foundation, including a nexus between himself and the Cowboys. It also questioned how he intended to prove the fourth element regarding reaching a position of safety. Counsel responded by explaining Mr. Capadona would testify as to each element in support of his affirmative defense. The district court warned Mr. Capadona that the justification defense was "so implausible on its face" that it could not "ever conceive of a jury buying into it" but indicated its

inclination to allow the defense to be presented to the jury nevertheless.

At trial, the district court permitted Mr. Capadona to present evidence in support of the justification defense. Mr. Capadona's first witness, an FBI investigator, testified: (1) the "Cowboys" Mr. Capadona complained about as threatening and retaliatory had worked at the Special Housing Unit (SHU), which is a different Florence FCC facility than where Mr. Capadona was held; (2) an investigation into the brutality of the guards known as the Cowboys was prompted by complaints received from inmates; and (3) their reign of violence ended almost a year before Mr. Capadona's August 1998 escape. Mr. Capadona now admits this testimony rebutted his claims about the Cowboys and the futility of inmates complaining about prison staff.

Following the FBI investigator's testimony, Mr. Capadona testified concerning his fear of the Cowboys based on what he had heard about them but admitted he could not name any individual who was a Cowboy, he did not have physical contact with them, and they were not at the same facility where he was housed or worked. However, he also testified with respect to the particular guard he claimed threatened him. Specifically, he explained he worked in the kitchen outside of his camp at another prison facility – the Administrative Maximum Facility (ADX) – where he and a staff member known as "Crockett" developed a

hostile relationship but that the situation improved after he raised the issue with kitchen administrators named "Garcia" and "Scofield." He stated hostilities again resumed, reaching a climax on the day of his escape, when, at the end of his shift, Mr. Crockett escorted him to the back of the kitchen to a sally port, slammed him against a wall, choked him, and goaded him to fight. When he refused to fight, he testified, Mr. Crockett advised him to "check in" to protective custody, but that if he did, Mr. Crockett had "something for [his] ass then." According to Mr. Capadona, Mr. Crockett's last words to him were that he (Mr. Capadona) was not leaving prison. He admitted that during this altercation, other people were "there" and "all grouped up doing things" but stated that no one actually witnessed the altercation. After the incident, Mr. Capadona testified, Mr. Crockett stayed at the ADX while he left the kitchen and took the bus back to his minimum security camp.

Based on these events, Mr. Capadona testified, he believed his life was in immediate danger, consulted with fellow inmates about the matter; and, a few hours later, escaped by walking away from the camp. He also testified he believed it would have been futile to report Mr. Crockett's actions to authorities and that he later did not take any action to report the matter to local, state, or federal agencies. While he offered that decent police officers existed, he testified that he did not trust them enough to report the matter. In addition, he

acknowledged he achieved a temporary position of safety from the immediate threat just a day or so after his escape and consulted with attorneys about the possibility of surrender but, despite their advice, never turned himself in because he was afraid of going back. He also testified that after his instant arrest, he did not tell the arresting officer or any of the California authorities that he feared for his life if returned to the Bureau of Prisons.

Following Mr. Capadona's testimony, a former inmate testified on his behalf, offering testimony Mr. Capadona confided in him about being threatened by a guard who pushed him against a wall on the day of his escape. However, this witness also testified that he had advised Mr. Capadona to report the incident to his case manager and counselor and admitted to previously stating that he believed another motive for Mr. Capadona's escape was his anger at the length of his sentence.

At the close of evidence, the government moved to strike the affirmative defense of justification on grounds Mr. Capadona failed to meet all but the third element of the justification defense – that no person was harmed during his escape. The district court agreed, finding Mr. Capadona failed to satisfy the other three contested elements in support of his affirmative defense. With regard to the first element, regarding an imminent threat, the district court determined even if

Mr. Capadona's version of events with Mr. Crockett was true, it amounted to a vague threat and an assault without injury, which was insufficient to show his life was in imminent danger, especially in comparison to other cases where the danger was far more pressing, extreme, and serious than what he faced. The district court also noted that after the assault, Mr. Capadona took a bus back to his minimum security camp and away from the officer, who was located at a different facility and a person distinct from his counselors or advisors, and that Mr. Capadona did not escape until four hours later – again, failing to demonstrate an imminent threat of death or danger, unlike other cases where the officer had a gun or knife or was pursuing the defendant.

As to the second element, regarding the futility of complaining or reporting any threats, the district court noted inmate reports on the Cowboys' violence were investigated and the guards were prosecuted and convicted, resulting in Mr. Capadona's assertions falling "far short" of showing that reporting his situation would have been futile. The district court also noted Mr. Capadona had pursued his legal rights repeatedly, both in its court and the Bureau of Prisons, and the fact that he did not always prevail did not mean that his situation would have been futile. As to the fourth element, it found that not only had Mr. Capadona reached a position of safety when he reached his camp away from Mr. Crockett, but he achieved a position of safety "very shortly" after his escape and

nevertheless failed to turn himself in or report the incident to anyone, even though he acknowledged police officers and guards existed who did not subscribe to guard-on-inmate violence. It further found Mr. Capadona's assertion he satisfied the fourth element regarding being unable to reach a position of safety for the six and one-half years following his escape "simply frivolous." Consequently, the district court ruled the justification defense could not be considered by the jury. After closing arguments, the jury found Mr. Capadona guilty of the charge of escape.

Prior to sentencing, the government sought a two-point enhancement for obstruction of justice under United States Sentencing Guidelines ("Guidelines" or "U.S.S.G.") § 3C1.1 based, in part, on Mr. Capadona's false pretrial assertions and trial testimony that prison staff assaulted him. Mr. Capadona objected, claiming his testimony concerning the threats against him constituted credible evidence and played no role in the trial, given the jury did not consider his affirmative defense. At a hearing on the issue, the government presented the testimony of Rene Garcia, the former food service administrator at the ADX, who was also Mr. Crockett's supervisor. Mr. Garcia testified: (1) he was unaware of any kind of altercation, argument, or anything of that nature occurring between Mr. Crockett and Mr. Capadona; (2) no complaints had ever been received from Mr. Capadona or any other inmate regarding Mr. Crockett, whom he described as

"an excellent supervisor" with "excellent reports"; and (3) if his deputy, Mr. Scofield, had received such a complaint, he would have told Mr. Garcia and they would have turned the matter in for investigation. He also testified he reviewed Mr. Capadona's file and it contained no complaint or request for transfer out of the kitchen and that inmates were not usually reluctant to complain about staff members.

Mr. Crockett also testified on behalf of the government and explained he had been a cook supervisor in the kitchen at Mr. Capadona's facility. Mr. Crockett stated that in his thirteen years as a cook supervisor with the Bureau of Prisons, supervising over a thousand inmates, no complaints had ever been filed against him by either staff or inmates, that he received nine performance awards, and all of his yearly performance reviews had been either "outstanding" or "exceeds." He testified that from the time Mr. Capadona began working in the kitchen in April 1997 until his escape in August 1998 he only supervised him twelve or thirteen times and had a vague recollection of who he was, what he looked like, and that he was a cook on the "p.m. shift." He also stated he did not recall any problems or anything out of the ordinary with Mr. Capadona; did not threaten or assault him or any other inmate; and, specifically, did not grab Mr. Capadona's neck, push him against a wall, or tell him he would not get out of the prison camp alive.

After the parties presented argument on the obstruction of justice issue, the district court found Mr. Capadona offered material and intentional false testimony with respect to the alleged threats and assault he received from Mr. Crockett, which it determined was "accompanied by a wilful intent to commit perjury, as opposed to mistake, accident, or faulty memory." It explained that it made this determination based on its finding Mr. Capadona lacked credibility, the fact the threats and assault were directly contradicted by Mr. Crockett and no complaint had ever been made against him during his entire employment with the Bureau of Prisons, and the unlikelihood that individuals present at the alleged assault would have continued to stand around and talk without taking action or reporting it, which it found was "simply incredible." As a result, the district court applied the two-point obstruction of justice enhancement to Mr. Capadona's base offense level of thirteen, for a total offense level of fifteen, which, together with a criminal history category of IV, resulted in a Guidelines range of thirty to thirty-seven months imprisonment. *See* U.S.S.G. ch. 5, pt. A (Sentencing Tbl.). After considering the parties' arguments, the applicable Guidelines, and the sentencing factors under 18 U.S.C. § 3553(a), the district court sentenced Mr. Capadona at the low end of the Guidelines range to thirty months imprisonment.

II. Discussion

A. Conviction

Mr. Capadona, now represented by different counsel than during his trial, appeals his conviction on grounds the district court erred in declining to rule prior to trial on the sufficiency of his affirmative defense of justification, thereby depriving him of the opportunity to make a reasoned choice on whether to testify or remain silent at his trial. He not only suggests that "deficiencies in proof" concerning his justification defense "were revealed early on in the trial" when the FBI investigator testified, rebutting his contentions concerning the Cowboys, but that it was clear, even prior to trial, that he could not establish as a matter of law the fourth element of his affirmative defense because no case existed in state or federal law that supported the justification defense when a defendant had remained at large for years without making an attempt to surrender to authorities. Because the deficiencies in his justification defense were so readily apparent, he asserts the district court should have ruled on the sufficiency of his evidence prior to trial and intimates that, at the very least, the district court should have ruled on it prior to his trial testimony, thereby sparing him from two days of trial on an obviously deficient defense which resulted in a negative finding he committed perjury, which, in turn, lengthened his sentence.

In making these assertions, Mr. Capadona suggests his arguments never

induced or swayed the district court to defer its ruling on the sufficiency of his justification defense, but, instead, the district court deferred its ruling based solely on its concern over wasting scarce judicial resources. He admits, however, that his position on appeal is "seemingly at loggerheads with his position below" and further concedes he never made an objection to the district court's decision to defer its sufficiency ruling, which he now asserts requires us to apply a standard of review of "plain error."

In opposing the appeal, the government argues Mr. Capadona invited or induced the district court to take the action it did when he asked it to allow him to present evidence on his affirmative defense, which the district court allowed him to do. As a result, the government asserts, Mr. Capadona waived any objection as to the timing of the district court's sufficiency ruling.

"[T]he invited-error doctrine precludes a party from arguing that the district court erred in adopting a proposition that the party had urged the district court to adopt." *United States v. Deberry*, 430 F.3d 1294, 1302 (10th Cir. 2005). Invited error is a form of intentional relinquishment of a known right, constituting waiver, which is not entitled to appellate relief, unlike forfeiture of a known right through neglect, which may be reviewed for plain error. *See United States v. Carrasco-Salazar*, 494 F.3d 1270, 1272 (10th Cir. 2007).

-14-

Under the circumstances presented, we conclude the invited error doctrine applies because any error Mr. Capadona now complains of was invited. This is because Mr. Capadona affirmatively urged the district court to allow him to present evidence in support of his affirmative defense, including his testimony, rather than rule on his affirmative defense as a matter of law, as the government requested.

To begin, when the government argued early on that Mr. Capadona's affirmative defense on the fourth element should fail as a matter of law, or when the district court initially indicated the deficiencies in Mr. Capadona's proffer of evidence, Mr. Capadona argued he had sufficient evidence to prove the elements of his defense which he should be allowed to present. In fact, when the district court warned Mr. Capadona of the difficulties and unlikelihood of being able to meet the requirements of his affirmative defense and otherwise questioned the adequacy of his justification defense, Mr. Capadona insisted he should be able to present evidence, including his testimony, to establish the required elements, arguing it was necessary to present a complete defense to the charge against him. He also suggested that if he could not produce sufficient evidence, then his affirmative defense should not be considered. It is for this reason the district court elected, however reluctantly, to defer its ruling on the justification defense until such evidence was presented, rather than make a determination, as the

government requested, as a matter of law. Incredulously, on appeal, Mr. Capadona now argues the district court should have ruled on his affirmative defense as a matter of law on the fourth element, rather than allow him to present his evidence in support thereof – the very thing against which he argued at the trial level. Accordingly, Mr. Capadona invited the alleged error of which he now complains.

In addition, contrary to Mr. Capadona's contentions, it is also clear the district court's concern about wasting judicial resources in having a hearing in advance of trial was secondary to Mr. Capadona's repeated pleas to allow him to present his justification defense evidence before making any ruling as a matter of law. In addition, we note that if the district court had required Mr. Capadona to present his evidence at a hearing rather than at trial, Mr. Capadona has not shown the district court would have ruled differently on his affirmative defense, he would not have perjured himself at that proceeding, or that such perjured testimony would not have been used to lengthen his sentence. *See United States v. Hawthorne,* 316 F.3d 1140, 1148 (10th Cir. 2003) (holding § 3C1.1 for obstruction of justice is not limited to perjury committed at trial, but extends to any judicial proceeding). As the government suggests, Mr. Capadona is, in effect, arguing the district court should have "saved him from himself" by ruling on his affirmative defense before hearing the evidence he sought to proffer.

Other weaknesses in Mr. Capadona's argument are further illustrated by the fact that while the FBI investigator may have dispelled Mr. Capadona's claims regarding the Cowboys early in the trial, Mr. Capadona's primary claim concerning Mr. Crockett's alleged threats and assault still remained and was not in any way dispelled or rebutted by the FBI investigator's testimony, leading us to believe Mr. Capadona elected to testify, in part, to present evidence on his altercation with Mr. Crockett in support of his affirmative defense. However, even if Mr. Capadona and his counsel felt his case suffered "deficiencies in proof" with respect to the FBI investigator's testimony or in regard to any other aspect of his case, it was up to him and his counsel to make a tactical decision before or even at trial as to whether he should testify, especially after the district court repeatedly warned about the apparent deficiencies in his offers of proof. To now argue, in essence, that he might not have testified had he known the outcome of the district court's ruling is disingenuous. For these reasons, we conclude the error, if any, of which Mr. Capadona now complains was invited,[1] requiring no further review on appeal.

---

[1] Because we have determined the error, if any, was invited, we need not specifically determine whether it was improper for the district court to decline to rule as a matter of law on his affirmative defense or to allow the jury to hear evidence on it before making a ruling.

## B. Sentence

Mr. Capadona also appeals his sentence, claiming the district court erred in applying the two-point enhancement for obstruction of justice based on its finding Mr. Capadona perjured himself at trial. On appeal, he claims the district court's finding he perjured himself at trial was based "on a clearly erroneous rendition of [his] testimony," as evidenced by the district court's finding the assault occurred in the presence of witnesses who incredibly did not see or hear it. To refute this description of his testimony, Mr. Capadona points out he never stated the altercation was loud enough to be heard by others and that he testified he was being choked and it occurred out of the kitchen in a sally port, where no one witnessed it. He further asserts any arguable inconsistencies in his testimony were based on the almost ten years between the altercation and the trial, implying that his memory may have been confused, mistaken, or faulty due to the passage of time.

Guidelines § 3C1.1 mandates a two-level increase if "the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense ...." U.S.S.G. § 3C1.1. "[C]ommitting, suborning, or attempting to suborn perjury" is sufficient to trigger the obstruction of justice enhancement. *Id.* at cmt. n.4. Perjury occurs when "[a] witness

testifying under oath or affirmation ... gives false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." *United States v. Dunnigan*, 507 U.S. 87, 94 (1993), *abrogated on other grounds*, *United States v. Wells*, 519 U.S. 482 (1997). This court has held the district court must "be explicit about which representations by the defendant constitute perjury." *Hawthorne*, 316 F.3d at 1146. We review the district court's factual findings in regard to obstruction of justice issues under the clearly erroneous standard, while reviewing its legal interpretations de novo. *See id.* at 1145. In order for a district court's factual findings to be clearly erroneous, we must conclude they lack factual support in the record, or, after reviewing all the evidence, we are left with the definite and firm conviction that a mistake has been made. *United States v. Martinez*, 512 F.3d 1268, 1276 (10th Cir.), *cert. denied*, 128 S. Ct. 2461 (2008). We give deference to the district court's credibility determinations and will not disturb such credibility determinations on appeal. *See United States v. Burson*, 531 F.3d 1254, 1259 n.4 (10th Cir. 2008). This includes credibility determinations in sentencing proceedings for the purpose of applying an enhancement for obstruction of justice. *See United States v. Cook*, 949 F.2d 289, 296-97 (10th Cir. 1991).

In this case, the district court found Mr. Capadona offered material and

intentional false testimony with respect to the alleged threats and assault he received from Mr. Crockett which it determined was "accompanied by a wilful intent to commit perjury, as opposed to mistake, accident, or faulty memory." The district court explained that it made its determination based on its finding Mr. Capadona's testimony about the threats and assault was not credible and directly contradicted by Mr. Crockett, who had never received a complaint against him during his entire employment with the Bureau of Prisons, as well as the unlikelihood individuals present at such an assault would continue to stand around and talk without taking action or reporting it.

Under these circumstances, even if, as Mr. Capadona contends, the district court made its perjury determination, in part, on an erroneous rendition of his testimony as to whether the assault occurred in the presence of witnesses, its ruling was also based on a credibility determination when it credited, over Mr. Capadona's testimony, Mr. Crockett's contradictory testimony that no threats or assault ever occurred. Given the deference we must afford district court credibility findings, we cannot say it committed clear error in applying the obstruction of justice enhancement. In other words, we are not persuaded, based on this credibility determination, that the district court's application of the obstruction of justice enhancement lacks factual support in the record, nor, after reviewing all the evidence, are we left with the definite and firm conviction that a

mistake has been made.

III. Conclusion

For these reasons, we **AFFIRM** Mr. Capadona's conviction and sentence.

**Entered by the Court:**

**WADE BRORBY**
United States Circuit Judge